IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FAIRCHILD SEMICONDUCTOR : 
CORPORATION and FAIRCHILD :
(TAIWAN) CORPORATION, :
 :
                Plaintiffs, :
 :
    v. :   C.A. No. 12-540-LPS
 :
POWER INTEGRATIONS, INC., :
 :
                Defendant. :
 :

---

John G. Day, Lauren E. Maguire, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE.

Blair M. Jacobs, Christian A. Ondrick, MCDERMOTT WILL & EMERY LLP, Washington, D.C.

    Attorneys for Plaintiffs.


William J. Marsden, Jr., Joseph B. Warden, Jr., FISH & RICHARDSON P.C., Wilmington, DE.

Frank E. Scherkenbach, FISH & RICHARDSON P.C., Boston, MA.

Howard G. Pollack, Michael R. Headley, FISH & RICHARDSON P.C., Redwood City, CA.

    Attorneys for Defendant.

---

**MEMORANDUM OPINION**


March 20, 2015
Wilmington, Delaware

**STARK, U.S. District Judge:**

Numerous pretrial motions are pending in this case. The Court heard oral argument on March 3, 2015. (*See* transcript ("Tr.")) In this Memorandum Opinion, the Court addresses only the parties' motions to preclude expert witnesses from providing opinions on certain issues. In one or more subsequent opinions or orders, the Court will address the remaining motions.

## BACKGROUND

On May 1, 2012, Plaintiffs Fairchild Semiconductor Corporation and Fairchild (Taiwan) Corporation (collectively, "Fairchild" or "Plaintiffs") filed a complaint against Power Integrations, Inc. ("PI" or "Defendant") alleging infringement of U.S. Patent Nos. 7,525,259 ("the '259 Patent"), 7,259,972 ("the '972 Patent"), 7,616,461 ("the '461 Patent"), and 7,268,123 ("the '123 Patent"). (D.I. 1) On June 21, 2012, PI filed counterclaims against Fairchild, alleging infringement of U.S. Patent Nos. 6,229,366 ("the '366 Patent"), 7,876,587 ("the '587 Patent"), 8,115,457 ("the '457 Patent"), and 7,995,359 ("the '359 Patent").

## LEGAL STANDARDS

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court explained that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in order to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Rule 702 requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony is admissible only if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." There are three distinct requirements for admissible expert testimony: (1) the expert must

be qualified; (2) the opinion must be reliable; and (3) the expert's opinion must relate to the facts. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

## DISCUSSION

**PI's Motion Relating to Fairchild's Claim for Damages for**
**Alleged Inducement with Respect to Fairchild's '972 Patent (D.I. 196)**

PI filed a combined motion for summary judgment and *Daubert* motion relating to Fairchild's claim for damages for alleged inducement with respect to Fairchild's '972 patent. (D.I. 196) At this point the Court is addressing only the *Daubert* portion of that motion.

PI argues that Fairchild's claim for damages with respect to the '972 patent should be excluded because Fairchild's damages expert, Mr. Malackowski, used the wrong date for his hypothetical negotiation. "[T]he date of the hypothetical negotiation is the date that the infringement began." *LaserDynamics, Inc. v. Qanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012). "[I]n the context of active inducement of infringement, a hypothetical negotiation is deemed to take place on the date of the first direct infringement ***traceable to*** [the defendant's] ***first instance of inducement conduct.***" *Id.* at 76 (emphasis added).

Mr. Malackowski "looked at the information over this time period [from when infringement began in 2008 through when inducement began in 2012] to determine if there would be intervening events or other reasons to suggest a change in [his] analysis . . . [and] did not find such intervening events." (D.I. 225, Ex. G at 66:2-8) He failed, however, to consider the April 27, 2012 jury verdict in *Fairchild II* (C.A. No. 08-309-LPS) finding no inducement of infringement of the '972 patent. (*See* D.I. 233 at 20) As PI writes, the "hypothetical negotiators would have known about the *Fairchild II* verdict, and the verdict certainly constitutes an

intervening event that would have changed the negotiation as between 2008 and April 27, 2012 with respect to Fairchild's claim of inducement," for reasons including that the verdict establishes an "absolute bar on any inducement liability predicated on Power Integrations' activities before April 27, 2012." (*Id.*) While Mr. Malackowski served a new set of damages calculations limiting damages for Power Integrations' purported inducement as of April 27, 2012 after the timing issue was pointed out to him, he adhered in this new analysis to his flawed assumption of a 2008 hypothetical negotiation date. (*See* D.I. 197 at 38-39 n.9)

In the briefing (but not in any separate motion), Fairchild contends that PI's expert also used a 2008 date for the hypothetical negotiation. (*See* D.I. 224 at 37 (*citing* D.I. 200, Ex. E at 144:10-145:8)) PI does not contest this allegation. (*See* D.I. 233 at 19-20) That both sides' experts used the same hypothetical negotiation date does not necessarily render this the appropriate date. The Court still has a gate-keeping function to perform. Having done so, the Court concludes that Mr. Malackowski's analysis must be excluded due to his use of the incorrect hypothetical negotiation date. Additionally, the Court *sua sponte* excludes the analysis of PI's damages expert to the extent it, too, relies on the incorrect hypothetical negotiation date.

Under the circumstances, the Court will provide both sides' experts an opportunity to serve supplemental expert reports, solely to use the correct hypothetical negotiation date, and provide each side an opportunity to serve rebuttal reports and to depose the experts – all limited to the new portions of the supplemental expert reports. The parties will be directed to submit a proposed order with the deadlines for completing this additional expert discovery.

**Fairchild's Motion to Preclude Dr. Kelley and Mr. Robinson (D.I. 198)**

Fairchild argues that PI's Dr. Kelley, an infringement and invalidity expert, should be

3

precluded as his analysis is unreliable for three reasons: (1) he improperly imports a new limitation into the "sense terminal" term; (2) he improperly imports a new limitation into the "generating a LED current" term; and (3) he does not provide an adequate elaboration of his opinion that the '259 patent is invalid under 35 U.S.C. § 112. The Court disagrees with Fairchild.

Regarding the "sense terminal" limitation, Fairchild specifically contends that Dr. Kelley imports a temperature compensation limitation into claim element 8(c). Fairchild's argument is based on Dr. Kelley's opinion that PI's LinkSwitch-PH doesn't infringe because "[t]here is simply no LED temperature compensation function," a conclusion Dr. Kelley supports with his Temperature Variation Test. (D.I. 200 Ex. C at ¶ 74) The Court construed "sense terminal" in claim element 8(c) of Fairchild's '123 patent as "the sense terminal is connected so that it detects a value of the LED voltage, not the LED light output, where the LED voltage is distinct from the LED current, and the LED voltage is coupled for adjusting the LED current." (D.I. 87 at 13) This construction makes no reference to temperature compensation – which is a stated objective of the invention found in the specification. (*See* D.I. 229 Ex. 1 at 1:44-46) PI argues that Dr. Kelley's references to temperature compensation are merely to explain what the claims, as construed, require as a matter of physics. (*See* D.I. 228 at 3) To this end, Dr. Kelley applies the Court's construction of claim element 8(c) to the accused products to show why they do not literally infringe, and then proceeds to explain why, among other reasons, the absence of temperature control makes it unlikely that the accused products can satisfy the elements of claim 8(c) even under a doctrine of equivalents theory. (*See* D.I. 200 at ¶¶ 68-79; *see also* D.I. 228 at 4 ("[H]e opines that the fact that they [the accused products] maintain a constant current regardless

of changes in temperature (and thus changes in LED voltage) tends to show that they do not include the claimed circuitry, which as construed must change the LED current in response to changing LED voltage.")) Accordingly, Dr. Kelley's references to temperature compensation do not render his opinions unreliable.

Regarding the "generating a LED current" term, Fairchild contends that Dr. Kelley improperly reads this term to require a "direct-drive type of circuit." (*See* D.I. 200 Ex. C at ¶ 55) The Court's construction of "generating a LED current" in claim element 8(a) of the '123 patent is "producing at an output terminal of the control circuit a current for controlling the LED." (D.I. 87 at 12) The Court's construction does not require a particular type of circuit. PI points out that Dr. Kelley's opinions related to the type of circuit are directed to what the Court previously identified as a "factual dispute for the jury to resolve": "While Defendant's expert contend[s] that ***an LED cannot be controlled unless current flows through the LED***, Plaintiffs' expert apparently disagrees." (*Id.* at 12-13 (emphasis added)) Dr. Kelley's discussion of the "direct-drive type of circuit" is in fact directly related to this factual dispute left open by the Court: "[A] person of ordinary skill in the art would recognize that the claim describes a direct-drive type of circuit like the examples shown in the '123 patent, ***where the 'LED current' is the current*** produced at the 'OUT' terminal and ***flowing through the LED***." (D.I. 200 Ex. C at ¶ 55 (emphasis added)) Fairchild's criticisms of this opinion are not grounds for exclusion but, rather, properly left to cross-examination.

Regarding Dr. Kelley's opinion concerning invalidity of the '259 patent under 35 U.S.C. § 112, Fairchild contends that it is too conclusory. The entirety of Dr. Kelley's opinion on this topic is as follows:

5

> The asserted claims are further invalid as indefinite, lacking in written description, and enablement in view of the elements requiring both that "the current provided to the load at the output terminal is substantially constant" and that the control circuit and feedback circuit are "operable to provide a constant current output to the load." The use of both "constant" and "substantially constant" in the asserted claims renders the claims indefinite and the patent's specification lacks any written description or enablement providing support for the presumed distinction between the scope of these terms. The "feedback circuit" element lacks antecedent basis and therefore additionally renders the claim invalid as indefinite.

(D.I. 200 Ex. D at Ex. 4 at 3 n.1-2) Dr. Kelley's analysis, while minimal, provides the bases for his opinion. PI has explained that "Dr. Kelley recognized that there was the potential for either an indefiniteness issue or for the terms to be read more broadly than the specification's disclosure," but "[i]t was not until Dr. Collins served his own rebuttal report that the issue under § 112 became clear" – namely, Dr. Collins' +/-10% requirement for the "substantially constant" current. (D.I. 228 at 7) PI states that "Dr. Kelley's opinions on 35 U.S.C. § 112 will only be offered (if necessary) in response to new opinions disclosed for the first time in Dr. Collins's rebuttal validity report and his deposition." (*Id.* at 6) To the extent Dr. Kelley's § 112 analysis is consistent with the disclosure in his initial report when applied as a response to the +/-10% issue, should it remain in the case, and in light of PI's concession that Dr. Kelley's § 112 opinion will only be offered in this limited context, his opinion in this regard is sufficiently reliable and will not be excluded.

Accordingly, the Court will deny Fairchild's *Daubert* motion with respect to Dr. Kelley.

By its motion, Fairchild also seeks to strike testimony PI would offer through another of its experts, Mr. Robinson. Fairchild argues that Mr. Robinson's "relative value allocation"

approach to apportionment is unreliable and, additionally, that he made a mathematical error that is fatal to the reliability of his opinion.

First, Fairchild complains that Mr. Robinson inappropriately used PI products in his apportionment analysis instead of using the accused Fairchild products. Although Mr. Robinson admitted that some of Fairchild's products consisted of smaller saleable units than PI's products (*see* D.I. 200 Ex. E at 94:5-95:3), his use of PI's products in calculating his apportionment percentages does not violate the smallest saleable unit rule, which the Federal Circuit has specified applies to the selection of a royalty **base**. *See VirnetX Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327-28 (Fed. Cir. 2014) ("[T]he smallest salable unit approach was intended ***to produce a royalty base*** much more closely tied to the claimed invention than the entire market value of the accused products . . . .") (emphasis added); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1202, 1226-27 (Fed. Cir. 2014) ("The principle, ***applicable specifically to the choice of a royalty base***, is that, where a multi-component product is at issue and the patented feature is not the item which imbues the combination of the other features with value . . . .") (emphasis added). Mr. Robinson properly relied on Fairchild's products in calculating a royalty base. (*See* D.I. 200 Ex. F at ¶ 120; D.I. 200 Ex. E at 94:5-95:3)

Additionally, Fairchild contends that Mr. Robinson's use of PI products resulted in a failure to adequately apportion the accused products. In apportioning value between the infringing and non-infringing products, Mr. Robinson did not analyze Fairchild's accused products, relying instead on an apportionment based on PI's products, based on his belief that PI's products "would have a relative value in the marketplace similar to what is exhibited by the Power Integrations products." (D.I. 200 Ex. E at 96:14-21) This is inconsistent with the

7

requirement that a damages analysis "apportion value between the patented features and the vast number of non-patented features contained *in the accused products*." *VirnetX*, 767 F.3d at 1329 (emphasis added). In order to reliably use PI's products for his apportionment analysis, Mr. Robinson would either have to demonstrate comparability between the proportion of patented and non-patented features in PI's products and the proportion of patented and non-patented features in Fairchild's products, or otherwise account for their differences in this respect. Neither of these approaches is provided in his analysis. This is of particular concern for the reliability of Mr. Robinson's apportionment analysis because none of the accused Fairchild products practices all four patents-in-suit. (*See* D.I. 200 Ex. E at 82:13-83:22)

Next, Fairchild argues that Mr. Robinson improperly relies on a largely irrelevant rule of thumb. Mr. Robinson's apportionment analysis begins with an assumption that up to 80% of value may be attributable to intellectual property, based on research showing that 80% of a high tech company's value consists of intangible value, such as intellectual property. (*See* D.I. 200 Ex. F at ¶ 177 & n.122) He thus apportions the relative value of various patents and other "intangibles" to add up to 80% based on an analysis of the PI products. (*See id.* at ¶¶ 178-79, sched. D4). Although Mr. Robinson's 80% estimate is only a starting point, it is not properly applied to the facts of this case because it deals with the value of high-tech companies rather than high-tech *products*. (*See* D.I. 200 Ex. E at 149:5-150:2) Accordingly, the 80% figure is improper. *See VirnetX*, 767 F.3d at 1333 ("Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion.").

Ultimately, Mr. Robinson's "relative value allocation" approach to apportionment, in

8

which he starts with a rule of thumb to apportion based on PI products and then applies the apportionment values to Fairchild products (*see* D.I. 200 Ex. F at ¶¶ 186-87; D.I. 200 Ex. E at 83:23-88:19), is an unreliable methodology that will not be helpful to the jury.

Lastly, Fairchild complains that Mr. Robinson's report includes a mathematical error, resulting in a ten-fold increase in the average sales price of one of PI's products used in the apportionment analysis. (*See* D.I. 200 Ex. E at 52:19-54:18; *compare* D.I. 200 Ex. F at sched. C1 p.1 *with* Ex. G at Ex. 20.6, Ex. 20.8) PI agrees that this issue should be corrected before trial. (*See* D.I. 228 at 20)

Accordingly, the Court will exclude Mr. Robinson's apportionment analysis, but he will be allowed to submit a supplemental report, to which Fairchild will be permitted to respond with its own experts' report, and Mr. Robinson and any Fairchild responding expert will be made available for depositions addressing the revised portions of their new reports.

## IV. CONCLUSION

An appropriate order follows.

9