```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
      POWER INTEGRATIONS, INC.,
 4                                        :  CIVIL ACTION
               Plaintiff,                 :
 5    v                                   :
                                          :
 6    FAIRCHILD SEMICONDUCTOR INTERNATIONAL,  :
      INC., FAIRCHILD SEMICONDUCTOR CORPORATION,:
 7    and FAIRCHILD (TAIWAN) CORPORATION,  :
                                          :  NO. 08-309-LPS
 8             Defendants.                 :
      ------------------------------------------
 9    FAIRCHILD SEMICONDUCTOR CORPORATION,
      and FAIRCHILD (TAIWAN) CORPORATION,  :  CIVIL ACTION
10                                         :
               Plaintiffs,                 :
11    v                                    :
                                           :
12    POWER INTEGRATIONS, INC.,            :
                                           :  NO. 12-540-LPS
13             Defendant.
                               - - -

14
                         Wilmington, Delaware
15                       Friday, April 5, 2019
                         Oral Argument Hearing
16
                               - - -
17
      BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge
18
                               - - -
19    APPEARANCES:

20
                    FISH & RICHARDSON, P.C.
21                  BY:  JOSEPH B. WARDEN, ESQ., and
                         BOB OAKES, ESQ.
22
                         and
23


24
                              Brian P. Gaffigan
25                            Registered Merit Reporter
```

1    APPEARANCES:   (Continued)

2

3              FISH & RICHARDSON, P.C.
               BY:  FRANK E. SCHERKENBACH, ESQ.
4                   (Boston, Massachusetts)

5                   and

6              FISH & RICHARDSON, P.C.
               BY:  JOHN THORNBURGH, ESQ.
7                   (San Diego, California)

8                   and

9              FISH & RICHARDSON, P.C.
               BY:  HOWARD R. POLLACK, ESQ., and
10                  MICHAEL R. HEADLEY, ESQ.
                    (Redwood City, California)

11                      Counsel for Power Integrations, Inc.

12

13             ASHBY & GEDDES, P.A.
               BY:  JOHN G. DAY, ESQ.

14                  and

15             MORRISON & FOERSTER, LLP
               BY:  ERIK J. OLSON, ESQ., and
16                  COLETTE REINER MAYER, ESQ.
                    (Palo Alto, California)

17                      Counsel for Fairchild Semiconductor
18                      International, Inc., Fairchild
                        Semiconductor Corporation, and
19                      System General Corporation

20

21

22

23

24

25

```
 1                          - oOo -

 2                  P R O C E E D I N G S

 3              (REPORTER'S NOTE:  The following oral argument

 4     hearing was held in open court, beginning at 10:50 a.m.)

 5              THE COURT:  Good morning.

 6              (The attorneys respond, "Good morning, Your

 7     Honor.")

 8              THE COURT:  I'll have you put your appearances

 9     on the record, please.

10              MR. WARDEN:  Good morning, Your Honor.

11              THE COURT:  Good morning.

12              MR. WARDEN:  Joseph Warden with Fish &

13     Richardson for Power Integrations.  We also have Frank

14     Scherkenbach, John Thornburg, Howard Pollack, Michael

15     Headley.  And then from our client, Mr. Cliff Walker in

16     the back.

17              THE COURT:  Okay.  Welcome.  Good morning to all

18     of you.

19              MR. DAY:  Good morning, Your Honor.

20              THE COURT:  Good morning.

21              MR. DAY:  John Day for Fairchild.  With me, Eric

22     Olson and Colette Mayer from Morrison & Foerster; and from

23     ON Semiconductor on behalf of Fairchild, Rob Tuttle and Josh

24     Engel.

25              THE COURT:  Okay.  Welcome to all of you.  So
```

1    we're here technically in two cases.  There is motions in

2    both cases and on both sides.  How do you propose to use

3    your time today?

4              MR. SCHERKENBACH:  Your Honor, we had thought we

5    would go first on the PI motion to enhance in what we call

6    the F-II case, the 2008 case.  It sort of covers the

7    waterfront on a number of issues and that is one chunk of

8    our presentation.  The second is inducement responding to

9    their JMOL on inducement and the third.

10             THE COURT:  So you would have them go first on

11   inducement?

12             MR. SCHERKENBACH:  I'm sorry.  What?

13             THE COURT:  You would have you them go first on

14   inducement?

15             MR. SCHERKENBACH:  Yes.  So I guess my proposal

16   is we go first on enhancement, and then if they want to

17   present their motion on inducement we'll respond, and they

18   can present their motion on damages and injunction, we'll

19   respond.  So it's sort of three pieces as we see it.

20             THE COURT:  And that is all the F-II '08 case?

21             MR. SCHERKENBACH:  It's actually both.  Unless

22   it's confusing for Your Honor, it's actually easy to deal

23   with each of the issues for both cases at the same time, if

24   I can put that it way.

25             THE COURT:  Okay.  What is the Fairchild view?

```
 1              MR. OLSON:  Our view would be that our

 2   preference would be actually to start with our motion for

 3   JMOL in the '08 case because we think that that motion and

 4   the new trial covers a lot of issues that will be repeated.

 5              But whether or not that goes first or not, we

 6   believe that our intent does actually rest on the papers on

 7   the 2012 case and we're content to do that.  To the extent

 8   that the 2012 case is argued, it may be Ms. Mayer will have

 9   a handful of comments but our anticipation was to spend our

10   time around the '08 case.

11              THE COURT:  Okay.  Well, let's do this.  Let's

12   hear the JMOL in the '08 case first.  And Power can respond

13   as it wishes.

14              MR. SCHERKENBACH:  Sure.

15              THE COURT:  Once we they have gone through all

16   that, then we'll hear argument on the motion to enhance on

17   the fees which I understand to be the '08 case but maybe not

18   entirely, and then whatever is left that anybody wants to

19   say about the 2012 case we'll do that after.  Understood?

20              MR. SCHERKENBACH:  Very good.  Yes.

21              THE COURT:  All right.

22              MR. OLSON:  Let me grab one more thing, Your

23   Honor.

24              THE COURT:  Sure.

25              (Pause.)
```

1          MR. OLSON:  So we brought a motion under Rule

2    50, Rule 59 for judgment as a matter of law and as to new

3    trial.

4          We believe that that motion involves four

5    primary legal issues and seven fundamental evidentiary

6    problems with the verdict which have been addressed in the

7    papers and that.  What I would propose to do is to do a

8    coverage of what each of those are quickly here and then I

9    will turn back to going through each one more specifically.

10          With respect to liability for induced

11    infringement, the law is that you must -- to find induced

12    infringement, you must prove each of four required elements

13    and they must be proven as to the full scope of the claim

14    that is being brought.

15          Secondly, under the law, if you choose not to

16    rely on specific instances but with respect to a class of

17    direct third party infringers, it is important that you

18    show each legal element, it's required that you show each

19    legal element of induced infringement, each of the four, and

20    they are necessarily met for the members of the class.

21          On liability, that leads to three fundamental

22    evidentiary findings on the record on the '08 case:

23          First, there is a lack of evidence of actual

24    third party importation sufficient to address the full scope

25    of the verdict.

1          Second, there is a lack of evidence of

2   causation, more specifically.  And causation, of course, is

3   required as we know from the Federal Circuit opinion arising

4   out of this case.  More specifically, there is a lack of

5   evidence of at least one successful communication that there

6   be successful communications to the third parties who

7   directly infringe.  That requires a communication that it

8   reach the direct third-party infringer and that the evidence

9   was the cause of the third-party infringer's conduct.

10          Third, there is no evidence of any affirmative

11   conduct by Fairchild or any induced infringement after July

12   of 2014 and thus the record cannot support a verdict for

13   that period.

14          When you turn then to damages, there are two

15   fundamental legal issues:

16          First, there is an obligation on the part of the

17   plaintiff to connect their damages to actual infringing

18   conduct.  Here, the infringing conduct is under 271(b) so

19   they have to connect the damages to induced infringement.

20          Second, there is a requirement that any royalty

21   be apportioned solely to the value of the patented feature

22   to the accused infringing product that is a quote out of the

23   2018 case from the Federal Circuit involving these parties.

24          So there are -- that creates four fundamental

25   evidentiary failings in the record with respect to the JMOL.

1                    First, the verdict exceeded every calculation of
2     damages provided in the record.

3                    The highest number provided on damages was by
4     Mr. Barnes and it was $21.6 million.  The verdict is
5     $24.2 million.

6                    There is no evidence of induced infringement
7     after July 1 of 2014 and yet the damages incorporate that
8     period.  So that is a repetition of the issue addressed
9     above in liability.

10                    There is also no evidence that all four required
11    elements are being addressed by the calculation of damages.
12    Neither Barnes' number, nor any testimony about a rule of
13    thumb or a rough industry standard or any other figure
14    addresses all four.  They address at best only whether or
15    not direct importation occurs.

16                    And, finally, Mr. Barnes 9 percent royalty is
17    not apportioned to the value of the patented feature.  He
18    did not know what the relationship was between the document
19    that he uses to develop the Product Selector Guide that he
20    uses to develop that theory and the patent.

21                    No one else showed the relationship to the
22    patent itself and to the patented features.  And he admits
23    that there is no evidence, he has no way of knowing whether
24    any of that evidence connects to any of the Fairchild
25    products.

1          For the same reasons that we believe that JMOL

2     is appropriate on liability, JMOL would be appropriate on

3     willfulness, we additionally believe the evidence regarding

4     knowledge, the lack of knowledge regarding the importation

5     of product supports the JMOL on willfulness.

6          Obviously, to the extent the Court finds there

7     is evidence sufficient to support a verdict but that the

8     verdict was against the great weight of the evidence, then a

9     Rule 59 motion would be appropriate.

10          With that, I will turn momentarily to each of

11     those, each of those items for the evidentiary failings and

12     the problems presented by the record.

13          Let me address at least two principles up front.

14     One is the claim that the prior Federal Circuit opinion from

15     which that resulted in a remand of this case is dispositive

16     as to the issues presented here.  It is not.  It is not

17     because that case did not address the issue of scope and of

18     damages further, so that automatically takes it outside of

19     the mandate.

20          The Federal Circuit addressed at best whether or

21     not there was -- not at best.  They addressed whether there

22     was induced infringement of any type.  Whether the record

23     could support that.  But it does not address in any way

24     scope, nor does it address the new evidence presented in

25     this case about scope, and thus, that's a difference from

1    the prior matter.  And there is evidence in this case about

2    who customers are, about what those customers did, about how

3    much was sold and to whom, all of which is different than

4    before.

5                 Furthermore, in fact there is evidence and

6    different evidence about what the relationship was and

7    communications were with those various people within the

8    supply chain.

9                 And, finally, there is actually differences in

10   the record that the Federal Circuit identified and omissions

11   that weren't present here.  Fundamentally, that is not of

12   significant import in comparison to the difference in the

13   question presented.

14                And, second, there is an argument that the

15   *Daubert* ruling as it relates to Mr. Barnes is dispositive

16   as to the question of damages.

17                So, first of all, there is just a mixing of

18   legal apples and oranges.  A *Daubert* ruling solely addresses

19   whether evidence is available and can be submitted under

20   702.  The Court made that ruling.  That does not address,

21   could not have addressed, wasn't presented in any way the

22   question of whether that evidence can support a $24 million

23   verdict which is, of course, what is received and that is

24   what the JMOL concerns.

25                THE COURT:  Now, there was also several summary

1    judgment rulings.  I take it you don't agree, but help me

2    understand why, that some combination of what the Federal

3    Circuit said and what I said prior to trial in connection

4    with summary judgment would seem to suggest, if not compel

5    denial of a large portion of your motion because your motion

6    argues there was nothing here to try.  You know, there is no

7    way that a reasonable jury could have done what it did.  So

8    help me understand how I can come to that conclusion given

9    what the Federal Circuit and/or what I said at summary

10   judgment.

11            MR. OLSON:  Sure.  I don't believe that the

12   JMOL ruling calls out or relies on the idea there was

13   nothing here to try.  The JMOL ruling is a determination

14   that the record as presented in this case and what will it

15   support and will it support the full scope of the verdict

16   rendered by the jury.  That issue, both in terms of scope of

17   infringing conduct and in terms of damages, was never before

18   the Federal Circuit.  So the Federal Circuit ruling cannot,

19   and has not, addressed that issue in any way.

20            Second, this Court said, I believe it is in

21   *Idenix*, it said elsewhere and the Federal Circuit has said

22   on a number of occasions, a ruling on a motion for summary

23   judgment is not determinative.  All it says is the case can

24   go to trial and one must present your evidence at trial.  It

25   does not -- because there is a genuine issue of material

1    fact which goes to the JMOL factors.  But that issue

2    was raised on the question of is there any induced

3    infringement whatsoever?  And the Court said, there is

4    sufficient evidence to go to the jury, and the parties

5    will present their case.  The parties did.

6              But then that raises a scope issue, a scope

7    issue that was not raised on either the Federal Circuit

8    opinion or on the motion for summary judgment, including

9    whether or not, for example, there are over 200 million;

10   whether it is 240 or 260 or 269, over 200 million units that

11   entered the United States.

12             Whether or not there was community?  What people

13   brought those in?  Whether or not there were communications

14   with those people, such that there could be a verdict of

15   that scope.

16             And certainly then all of the damages issues

17   surrounding whether or not the $24 million in excess of all

18   the prior numbers are justified by the evidence, could be

19   found reasonably by a jury in light of the evidence, as well

20   as the issue regarding apportionment in light of the full

21   evidence presented, and the question of whether or not there

22   is evidence sufficient to show class as a category and that

23   it was necessarily met with respect to the class.

24             So the Court says --

25             THE COURT:  So do you concede that some portion

1  of the judgment of induced infringement has to stand even if

2  I grant your motion?

3          MR. OLSON:  Certainly the judgment of direct

4  infringement by Fairchild has to stand.  We haven't

5  challenged that.  The judgment of induced infringement I do

6  not believe can stand as to the full scope of this verdict.

7          So when we speak to what, this verdict I believe

8  cannot stand.  Is there evidence of direct importation by a

9  third party in this case?  Yes, there is evidence that shows

10 that there is at least 30,000 products that entered the

11 United States.  Those came from distributors.  There is

12 evidence of communication with those distributors by

13 Fairchild and thus we believe that that has evidentiary

14 basis for purposes of the outcome, but no more.

15         THE COURT:  So is the relief you are seeking,

16 judgment as a matter of law for your client, that there is

17 no induced infringement and we're done, this case is over?

18 Or is it the full scope of this verdict of induced

19 infringement can't stand, let's figure out what to do next

20 after that?

21         MR. OLSON:  So we believe both would be a

22 correct outcome for the Court.  We believe the Court

23 actually can, based on the evidence presented, make a

24 determination under Rule 50 that there is insufficient

25 evidence to demonstrate all elements of induced infringement

1    as to any class because it would have to be necessarily as

2    to a class, no class has been identified, no evidence that

3    all communications were going consistently to a class.

4           Nonetheless, even if the Court concludes that

5    there is evidence of some induced infringement, substantially

6    less.  In this case, we're talking about literally .002

7    percent less than the full verdict rendered, then both a new

8    trial would be appropriate and/or, of course, a damages JMOL

9    would be appropriate.  And a damages JMOL would be appropriate

10    to this number or alternatively a new trial as to damages or

11    alternatively a remittitur as to damages in light of the

12    maximum amount of the evidence can show.

13           THE COURT:  Other than the post-July 2014 period

14    where I think you are clearly arguing that promises were

15    made in connection with summary judgment about evidence

16    that would be presented that you say actually never was

17    presented, I think I understand to be at least part of your

18    argument.  With respect to other portions of the case, are

19    you here to say that there is a material difference between

20    what I was told at summary judgment was the record and what

21    was actually presented to the jury at trial?

22           MR. OLSON:  Yes.  Yes, Your Honor.  I am.  So,

23    first of all, I do agree with you that as to July of 2014,

24    there is plainly and specifically a material difference

25    between what was said what was going to be happening and

what happened.  There is now no dispute between the parties
that there is no evidence of any type about conduct after
July of 2014.  There is literally no evidence of any type of
Fairchild activities after 2011 by way of the documents that
have been cited in connection with the case.

But also, there was an allegation that there
would be proof as to a class and as to a class of people
with who would infringe, and would be direct third-party
infringers.  They would be proven to be third-party
infringers.

For example, there was a discussion about
retailers.  Was there going to be evidence about connection
to retailers.

And there was a statement, well, we would make
the indirection connection to the retailers but in fact the
evidence it's quite clear.

Mr. Sutherland said, we don't talk to retailers.
Also did Mr. Hertz.  No one said there was communication
with retailers, and retailers were identified as a category
of people who might, at least within this industry standard,
rule of thumb, be bringing evidence in.

I think that is a difference from what was
argued before.  There is also an argument that was made
regarding OEMs.  There was going to be evidence of a
connection to OEMs showing how much OEMs, original equipment

manufacturers, were bringing into the United States.  And a
connection and a successful communication with OEMs, that
evidence is absent.

What the evidence shows is that Fairchild was
speaking to distributors, but the evidence is also shows the
distributors brought in only .006 percent of the material
that was sent to them.  And there has been no argument
that ultimately amounts to less than 30,000 units, so
distributors to the extent they are a direct third-party
infringer and have communications, can't support the full
scope of the verdict.

There is absolutely evidence that there are
connections and communications with ODMs.  For example, they
say you provided datasheets to OEMs.  You talked to ODMs.
But there is zero evidence in this case, zero evidence.  I
would challenge Mr. Scherkenbach to identify the evidence,
as to ODMs bringing product into the United States.

The evidence consistently is the ODMs, and this
is not a debated point about whether these are the people
to whom we sell.  I believe it's 974, but there was a
spreadsheet that showed all of the customers that came in.

Dr. Handfield went over that and said:  If
you look at the first 20 which are more than 80 percent I
believe of all of the units, all of them are either
distributors or ODMs.

1              And that material goes to the ODMs.  The ODMs

2      are predominately in Asia, and that they go on to sell to

3      other parties.  And it's those other parties who might then

4      sell to other parties.  Retailers bring it in or the ODMs

5      might bring it in in a different -- really, I think it

6      arises more in the enhancement conduct.

7              Mr. Sutherland has said, we don't really know,

8      we don't have that connection.  We're disconnected from that

9      process with respect to who brings it in.

10             So all of these are differences regarding the

11     claim that was -- that they said would be made under summary

12     judgment regarding class.  That there would be a class

13     evidence sufficient to support a verdict.  That there is no

14     class evidence sufficient to show a verdict.  There is not

15     an evidence that the ODMs brought the product into the

16     United States.  Consequently, that eliminates one element.

17             Further, there isn't evidence of Fairchild

18     communicating with the OEMs to the extent that they're

19     bringing the product into the United States.  And actually

20     everyone agrees that neither Fairchild nor Power

21     Integrations was talking to retailers to the extent they

22     were bringing products into the United States.

23             Let me turn back to this question about what

24     came back into the United States, where and what is the

25     evidence on that point.  At the end of the day, on this

point, the evidence comes down to this question of this rule

of thumb and it was referred to in that way when there was

cross-examination of Dr. Handfield about this idea that the

there was some industry number that one-third would come in.

Now, the one-third evidence has a number of

problems.  The first of it is, is that it is sort of this

rule of thumb, the way Mr. Balakrishnan said, roughly about

one-third of products come in.  Again, Mr. Sutherland refers

to it as a rule of thumb.  They referred to it as a rule of

thumb regarding with Dr. Handfield.  And the question of

what does it apply to?  Well, it is said to apply to all

products of any type.

Mr. Balakrishnan talks about, well, of the world

of products, one-third goes to Asia, one-third goes to

Europe, one-third goes to the United States.  The lack of

specificity is a fundamental problem in light of the Federal

Circuit's opinion in 2013 arising out of the 2004 case.

And in that opinion, which was ultimately a

grant of JMOL, I note, it was a grant of JMOL on induced

infringement.  They said, it is not enough to know that

Samsung sells one-third of their mobile phones or, excuse

me, 18 percent, I'm sorry, 18 percent of their mobile phones

within the United States.  Because you don't -- even though

Samsung is known to be a customer of Fairchild, you don't

know that those mobile phones will have chargers and second

you do not know that the 18 percent is reflective of the amount attributable to Fairchild's infringing product.

This one-third evidence has fundamentally the same problem, and that is there is no evidence that shows that Fairchild's sales are so widely distributed that they are equivalent to the distribution of all products around the world or all electronic products around the world or that they match this one-third estimate.

Now, of course, the evidence and the verdict is, I believe when you look at it, is 34 percent which is about one-third, but even when you speak to the one-third, the one-third is too vague and fails to make what the Federal Circuit referred to as a direct connection. A direct connection is needed between. There, they said Samsung sales of mobile phones, and the importation of the infringing product.

Here, I would say there is no direct connection between the distribution of all electronic products around the world and evidence of the distribution of Fairchild's individual infringing chips, more specifically, the infringing chips involved in this case because it wouldn't be enough. It was just the Fairchild chips alone.

Let me turn then, now that I have covered --

THE COURT: Yes, before you do that one, that definitely sounds like something I decided at summary

1    judgment.  Didn't the one-third evidence that came in and

2    there was some from your own people I think on Fairchild's

3    side, that came in the way we expected it would come in,

4    didn't it?

5              MR. OLSON:  I would say it came in a little

6    differently than the way I expected it to come in.  Certain

7    parts of it came in.  Let me tell you one part that is

8    absolutely that is literally that deposition evidence and

9    then they read it.  That was Mr. Shah's testimony.

10              Mr. Shah says:  I don't know what the number is.

11    I don't have any detailed calculation.  I know that there is

12    20 to 30 percent.

13              All right?  That is a fair estimate, but I don't

14    know which it applies to, and he certainly doesn't articulate

15    as to whether it applies specifically to these products.

16              But here is the issue on summary judgement.  The

17    fundamental focus was a question of whether or not there was

18    sufficient successful communications, which would be another

19    obviously relevant evidence needed to be captured as to if

20    you are going to apply the one-third, you are going to also

21    have to apply it here.

22              Fundamentally, I do not think that the summary

23    judgement motion -- I would disagree, but I can understand

24    -- and here is what I said:  The one-third comments from

25    Sutherland and Balakrishnan came in differently than some of

1    their deposition testimony in, for example, roughly

2    one-third.  And then it being just worldwide products as

3    opposed to some of the testimony that came in before.

4              THE COURT:  All right.  So you don't think you

5    challenged the supposed lack of specificity or lack of

6    direct connection of the estimate of how much was imported

7    prior to trial?

8              MR. OLSON:  I believe we -- no, I agree.  That

9    we did address that question, and we addressed the question

10   of connectivity, that is, the successful communications.

11   Both of those are raised, but they are different.  I believe

12   the one, the evidence is different.  And there was this

13   further discussion about there being evidence of a class on

14   summary judgment.  And that evidence has not -- let's just

15   take the class question for a minute.

16             There is literally no reference to class in the

17   evidence.  There is a reference to class in the rebuttal

18   closing by Mr. Scherkenbach.  That is the only evidence,

19   that is the only reference other than the Court's jury

20   instructions.

21             On the summary judgment motion, there was a lot

22   of reference we were going to prove it by way of a class.

23   And if you are going to prove it by way of a class, you have

24   to show that there is a class that is doing the importing.

25             The one-third evidence does not connect to any

class.  The one-third evidence says one-third of products,

of electronic products come into the United States.  It

makes no identification of who brings those products in.  It

makes no identification of how they bring it in, when they

bring it in, what the circumstances behind them coming in.

It just says there is one-third of products that come into

the United States, which really takes us to the second

problem.  This problem of successful communications.  You

have to have evidence in which applies both at a class level

and an individual level.

You have to have evidence that there was a

communication by Fairchild that there was an affirmative

act by Fairchild that is connected to this member of class.

It has to be connected to, because it has to induce, the

third-party direct infringer.

It is not enough that you -- so the prior

verdict, the prior Federal Circuit decision in this case,

it is not enough that product comes in.  It is not enough

that you had affirmative acts.  It is not enough that you

know that product will later come in through the chain of

commerce.  You actually have to show successful -- you

have to show causation which they say relates to an

identification of successful communication to the direct

infringer.

We went through every Federal Circuit case we

1    could find.  We put a bunch of them in our footnote in our

2    brief, and is there any case that we could find in which

3    there was any circumstance where the argument is we have

4    a communication, we have an affirmative act, but it didn't

5    actually reach the third-party infringer?  We could find

6    none.  We give examples of the repetition in prior rulings

7    of the successful communication obligation within our

8    footnote.  But you have to have all of those elements and

9    you have to show that they're necessarily met at the class,

10    and that has not been done here.

11           I'm going to turn, if I can, to the damages

12    issues before I reserve some time for rebuttal on this

13    motion.

14           On the damages issues, there is $24.3 million in

15    the verdict.  That is well above the highest number presented

16    by the evidence which is $21.6.  Thirty-three percent alone

17    won't solve that problem, nor its 34 percent of sales at

18    $0.09.  That is not disputed.

19           Nor is $0.10 cents plus 30.2 sufficient to

20    resolve the issue.

21           The evidence just does not have any explanation

22    or support for it.

23           I come back to the July 2014.  There is no

24    evidence, none whatsoever, regarding any conduct in July --

25    after July of 2014.  Now, the Court excluded the evidence

1   regarding the injunction, but we know actually that there

2   was activity beyond the normal course in the full record.

3   But as to the evidence in the record, there is none at all

4   regarding July 2014.

5           And then turning to this issue of Mr. Barnes.

6           Mr. Barnes number, if it can show anything, it

7   only shows importation.  It cannot show successful

8   communication.  It cannot show causation.  You cannot have

9   damages for something that is not an infringement.

10          The fact that it's a third-party infringement

11  potentially is not sufficient to prove a claim.

12          And, lastly, on Mr. Barnes $0.09 royalty.

13          The key question, there is no question, this is

14  not the only valuable item.  In fact, Mr. Balakrishnan said,

15  85 percent of this product is coming from other sources.

16  The value is coming from a different source.  The '079 case.

17          They went out, they sought a $139 million

18  verdict in connection with that.  It has now been reversed

19  because of the failure to apportion, but they come back here

20  and say, no, we're still going to seek 64 percent of

21  profits, we're going to seek 64 percent of sales or

22  revenues, three times profits, and the evidence we're going

23  to use for that is the Product Selector Guide and two pieces

24  of it that say the word "frequency jitter."

25          Now, the evidence is undisputed that frequency

1    jitter is not what the patent is.  That they were not the

2    first to present frequency jitter, and they were not the

3    first to present frequency jitter in a power supply.

4              But neither Mr. Balakrishnan, nor Mr. Sutherland,

5    nor Dr. Kelley addressed whether this document was limited

6    solely to the patent.

7              And Mr. Barnes admits that he does not know that

8    it is limited to the patent.  In fact, he has made no effort

9    to find that out.  I could show you his testimony, but we

10   have cited it, and he says specifically, I do not -- let me

11   take the time to read it.

12             You did not take any type of technical

13   investigation to figure out whether the Product Selector

14   Guides cost savings numbers are specific to the patents as

15   opposed to jitter more generally, correct?

16             He says:  I did not undertake a technical

17   analysis.  That is outside my area of expertise.

18             He admits he never talked to Kelley.  He didn't

19   talk to Balakrishnan.  He didn't talk to Sutherland.  He

20   made no effort to connect this to the patented feature

21   itself.

22             Moreover, he also fails in regard to the

23   question of whether or not it applies to the Fairchild

24   product.

25             He does not know whether or not -- he has done

1    no analysis and does not know whether the $0.03 or the $0.20

2    from which he based his analysis would be achievable with

3    Fairchild products.

4              He says:  No, I have not done that analysis.

5              So we know neither that it is the patent and we

6    do not know that it applies to the accused product and its

7    use in the accused product.  And those are the two

8    requirements stated in the 2018 case by the Federal Circuit.

9    So they're not met.

10             It is also true that the $0.09 is in fact not

11   what Fairchild would say.  It is a customer number and

12   Mr. Barnes said, I have not done any analysis to determine

13   how that $0.09 would be used or split.

14             Under those circumstances, and given the size of

15   the award, which is 64 percent of the alleged revenues, this

16   is inadequate to demonstrate apportionment which is required

17   for each reasonable royalty.

18             THE COURT:  On the $24 million figure, I

19   understand where you have to kind of figure it is more than

20   the plaintiff had argued for.  That doesn't seem however to

21   be a cap as a matter of law on what the jury could award.

22   Do you agree with that?

23             MR. OLSON:  I agree that there is not a legal

24   cap regarding whether or not the -- well, actually let me --

25   there is not a legal cap around profits.  There is a legal

cap around evidence must be no more than what the evidence

as a whole will support, and certainly the evidence of what

the expert says is part of that.  There is no other evidence

presented regarding what the damages were or would be that

are in excess of it.

The argument was made it could be up to $0.20,

but when you actually look at what that evidence is, at 285,

the evidence is there are two numbers on here, $0.03 and

$0.20.  Do you agree there are two numbers here?

Yes.

Do you agree that is the up to or high side

estimate in each case?

The answer was:  Yes.

Mr. Barnes was asked:  There is $0.23 in profits

in margin at Power Integrations?

But then when asked, well, isn't that what the

royalty could be?

He said no, I don't agree that is what the

royalty is.  The royalty would be the outcome of a

hypothetical negotiation, which is $0.09.

Of course, the law is and the instructions are

that it has to be the outcome of a hypothetical negotiation,

not what someone would demand.  So I don't believe the

evidence would support an amount in excess of it.

Do I believe?  Certainly, it is true in the law

1    that the jury has the right to reject either party and come

2    out in between, but if it chooses to reject both parties and

3    come out above the highest number, there must be evidence in

4    the record that demonstrates how that could be achieved and

5    what evidence supports it.

6              THE COURT:  Right, which means I think I have to

7    analyze whether a reasonable fact-finder could find evidence

8    in the record to support the $24 million number.  It's a

9    relevant consideration that the plaintiff didn't ask them to

10   do that, that number, but it's not per se a cap.  I think

11   you are agreeing.

12             MR. OLSON:  I agree with you on that, and I

13   then tried to deal with what I believed was the evidence

14   around this $0.20 figure.  So it's not an a legal cap.  I

15   think it is, maybe I will call it a legal red flag around

16   the circumstances, particularly in light of the evidence

17   surrounding apportionment.  But even beyond that, even

18   assuming this was somehow properly apportioned, we disagree

19   with it, you have to have evidence that shows how or why

20   the amount in excess was somewhere justifiable and also

21   justifiable and in light of the full evidence underneath.

22   So, for example, how do you account for July of 2014?

23             But with that, I think I would reserve my time

24   for rebuttal.

25             THE COURT:  Okay.  Fine.  And we will hear from

```
1    Power Integrations.
2             MR. THORNBURGH:  Thank you, Your Honor.
3             THE COURT:  Good morning.
4             MR. THORNBURGH:  Good morning.  We have prepared
5    a few slides.  May I approach?
6             THE COURT:  You may.
7             MR. SCHERKENBACH:  Your Honor, this is the
8    roadmap.  Mr. Thornburgh is going to address inducement and
9    then Mr. Warden is going to address damages, so two pieces
10   in response to.
11            THE COURT:  All right.  Thank you for that.
12            MR. THORNBURGH:  So, Your Honor, we do tend
13   to agree that this motion is very much like the summary
14   judgment on inducement that Your Honor considered in the
15   fall.  And it is also very much like the Federal Circuit
16   considered after the 2012 trial.
17            So we prepared these slides.  I will be brief,
18   but mostly want to answer any questions that the Court may
19   have.
20            But most of their motion is about the evidence
21   as they said, and it is substantial evidence and so it is a
22   jury question.
23            We also think that JMOL is actually facts
24   precluded by law of the case because, and I will get into
25   that in a moment.
```

1          Fairchild emphasizes that there is the four

2     elements that the Court put in the jury instructions.   And

3     the cite there is to the jury instruction.

4          And we believe there is absolutely substantial

5     evidence that the jury received on each of these elements.

6          Starting with direct infringement, we got the

7     admission that Mr. Lam -- this is a quote actually from the

8     2012 trial that we reused in this trial where their

9     executive said there will be products coming into the U.S.

10          That is direct infringement.

11          We have the previously established fact that if

12     the products come into the U.S., they infringe.   So for

13     direct infringement, we just have to prove they come in.

14          We have the specific examples where we went out

15     and purchased the products.   We found them here in the U.S.

16          We also have more admissions besides just

17     Mr. Lam that the products do come into the U.S.

18          We got that during the most recent trial from

19     both their expert Mr. Handfield and from their executive

20     Mr. Dustin Chiang.

21          And we have reliable estimates from multiple

22     sources about what percentage of those imports are.

23          So that is direct infringement, the first element.

24          The second element, intent.   It is absolutely

25     Fairchild's intent in spades for this to happen.   This was

1      their business plan for these products to come to the U.S.

2                  Their executive Mr. Lam even used the words:  It

3      is our intention for this to happen.

4                  And then Fairchild went to extraordinary efforts

5      to make it happen.  And, again, that is circumstantial

6      evidence of intent.

7                  For example, trying to help its customers meet

8      U.S. standards like UL, FCC, Energy Star, and California

9      Energy Commission.

10                 Then Fairchild also specifically offered

11     indemnity for U.S. patent infringement which again shows

12     circumstantial evidence of intent.

13                 Here is an example of a document that

14     illustrates this type of circumstantial evidence.

15                 This is a Fairchild customer design support

16     document that was seen by the jury.  It's PX-739.  It's

17     helping a customer meet both FCC and UL.

18                 And then we had testimony from multiple

19     witnesses including Mr. Sutherland here on page 330 of the

20     most recent trial explaining that UL is expensive.  You

21     don't go out and get UL if you don't need something to

22     come into the United States.

23                 Is it fair to say if we see the logo on a

24     product, it's because the manufacturer intended for it to

25     come to the U.S.?

1                    Yes.

2                    And the products that we found in the U.S. with

3          the infringing Fairchild parts were marked UL.  And the U.S.

4          and the UL means United States.

5                    Here is another example from PX-374 from the

6          trial, the Fairchild document that specifically mentions

7          Energy Star and California Energy Commission.

8                    PX-084A was an indemnity agreement that

9          specifically says that buyer uses such products in the

10         manufacture of power supplies which are sold in the United

11         States and other countries worldwide.

12                   So because Fairchild's customer was planning to

13         ship into the U.S. and Fairchild knew that, Fairchild gave

14         them indemnity for U.S. patent infringement.

15                   And there was testimony that we put in our brief

16         that Fairchild after -- this was actually an SG agreement

17         but Fairchild kept on doing this as a standard term and

18         condition.

19                   Next.  So that was the element, the second

20         element, intent.

21                   Third element is awareness.

22                   You know, this is awareness of the patent

23         basically.  And that was all established in trial transcript

24         212.  We know that both Fairchild and SG were aware of the

25         patents-in-suit in 2001 through 2005, all before suit.

1              Actually 2001, 2002 and 2004 for the awareness.

2       The first sale was in 2005.

3              Then we also have the testimony from W.H. Huang

4       about the awareness of the key management group at SG right

5       after this lawsuit was filed where they realized that they

6       really had no defense to infringement.  And I think this

7       will become more a subject of the enhancement motion that

8       Mr. Scherkenbach will address later, but it's also more of

9       an awareness.

10              We came to realize switching capacitor was

11       insufficient to avoid infringement.

12              Last element, causation.

13              Fairchild went to significant effort to cause

14       U.S. sales.  That was their business plan.  That was

15       Mr. Lam's intent.

16              They designed their parts to meet U.S.

17       standards.

18              They helped customers to meet U.S. standards.

19              They offered customers indemnity for U.S.

20       infringement.

21              They offered customers technical assistance and

22       documentation.

23              They maintained a technical support center in

24       the United States.

25              They specifically competed for U.S. business.

1          They provided demo boards to the U.S.

2          And they enabled customers to find a U.S.

3    distributor on Fairchild's website.

4          Those are all the efforts that Fairchild took

5    to cause the U.S. sales.  Very similar to the 2012 trial,

6    but, you know, even more evidence this time.

7          We also got this time testimony from our expert,

8    Dr. Kelley, that you have to have successful communications

9    for these parts to even be used because they're too

10   complicated to use.  You can just buy them and plug them in.

11   You have to have a communication from Fairchild to explain

12   to you how to do that.

13         This is just more evidence from Mr. Lam saying

14   that he knows that the imports happened.  Here is quotes

15   from Mr. Chiang and Dr. Handfield, again, admitting that

16   Fairchild knows that third parties are doing imports of the

17   infringing products.

18         This was a slide that we used several times at

19   trial that explains how Fairchild caused infringement.  It

20   goes to all of the prefatory efforts that I have summarized

21   that it helps customers design their products, it helps them

22   meet U.S. standards, and it gets a design.

23         And then after that, the customers do exactly

24   what Fairchild intends, which is to get the products to the

25   United States, and their defense all rests on what happens;

1    and they say no visibility, no control.  But that is after

2    they have already induced.

3              They have created the world in which this

4    happens.  They have caused it to happen.  They can then

5    sit back and it happens but their inducement has already

6    occurred.

7              The jury was very specifically instructed on

8    actual causation.  More than once, this is a quote from

9    the specific instruction on causation.  So the jury was

10   presented with this very specific question of whether

11   Fairchild actually caused the infringement.

12             They found, yes.

13             And there, the jury's implicit finding of

14   causation is supported by substantial evidence.

15             That Fairchild intended for sales in the U.S.,

16   went to great effort to make it happen.  They admitted that

17   they know their customers import the infringing parts and

18   the infringing parts were found here.

19             Circumstantial evidence enough to find that they

20   caused this to happen.

21             And the evidence is at least as strong as from

22   the 2012 trial that this Court and the Federal Circuit found

23   sufficient.

24             The successful communications argument that they

25   make again in this motion, the Court specifically ruled in

1   the context of the jury instructions and in the fall trial,

2   that the Court went back and looked at the Federal Circuit's

3   decision and stated that acts as a broader concept are more

4   pertinent than just communications.

5           And we believe the entire conduct that Fairchild

6   undertook is the cause, even though there are substantial

7   evidence of successful communications because the products

8   can't be used without instructions.

9           Fairchild in their most recent brief references

10  that a key to the case both at the Federal Circuit level

11  and then back at the District Court, but what is interesting

12  about this case in the last case that they cite in their

13  reply, if you look carefully at that case, which is 218 WL

14  652 1922 at page 3, that it expressly distinguishes our

15  case.  And it deals with, in our 2012 case, that the Federal

16  Circuit said we had enough evidence to infer causation

17  whereas in that other case, it was about drug labels and

18  the policies of encouraging generic manufacturers to be able

19  to avoid infringement for off-label use.  And that they

20  declined to find causation just from a vague drug label as

21  opposed to Fairchild building an entire infrastructure to

22  implement its business plan to have U.S. sales.

23          Fairchild spent some more time on this motion

24  trying to argue they have to prove, that we had to prove

25  specific acts leading to specific infringements.  This Court

1    rejected that in 2012.  The Federal Circuit affirmed and

2    said that that -- well, none of this evidence can be

3    directly linked to a specific printer or notebook.  That is

4    not required.  And that we can prove infringement as a

5    class.

6          Another response to Fairchild's reply on

7    inducement of whether Fairchild induced the OEMs.  The

8    evidence was certainly sufficient for the jury to infer that

9    the ODMs and the OEMs worked together.  That the ODMs are

10   actually the OEMs subcontractors, and so Fairchild induced

11   them both together.

12         And just because they're independent companies

13   doesn't prevent them from being partners and being

14   subcontractors.

15         And, again, as they go through and nitpick each

16   piece of our evidence, it is very much like what the Federal

17   Circuit rejected after the 2012 trial when they said, okay,

18   fine.  You can go after this exhibit and this exhibit and

19   find small flaws here and there, but you are missing the

20   forest for the trees.  And that is exactly what Fairchild is

21   doing again here.

22         Again, here that the overwhelming inference

23   that the jury rightfully found from their pattern of conduct

24   is that they meant for this to happen and they caused it to

25   happen.

1              THE COURT:  Did they mean for it to happen to a

2     class of infringers?

3              MR. THORNBURGH:  So the class issue is, they,

4     in their summary judgment, they tried to break it down as a

5     retailer is it the ODMs, the OEMs.  And we responded more

6     broadly that the class is, is the group of people who do the

7     importing.

8              And those people may be broken down into those

9     various subcategories.  But our evidence proved that Fairchild

10    caused everyone who imported to do it.  Because they built

11    the products to come into the United States.  They made them

12    comply with U.S. standards.  They encouraged people and

13    indemnified people, and so they induced everyone that did

14    the importing.  And, you know, mostly the importing I

15    believe is the OEMs.  That is what we said in closing, and

16    that Fairchild very much induced them both directly, there

17    is evidence of direct communications with OEMs and by

18    working with the ODMs and the OEMs subcontractors to cause

19    those imports to happen.

20             THE COURT:  Was the jury told that that was the

21    class that they should be focused on?  That is, whoever imports?

22             MR. THORNBURGH:  So we don't believe that we had

23    to have a witness say the word class.  That that is a legal

24    concept, and it's the Court's job to make sure that standard

25    is met.

1           And so what we did tell the jury in closing was

2       that the class was largely the OEMs.

3               THE COURT:  There was no witness that talked

4       about here is the class, and this is the class that I find

5       and you, jury, should find are the ones who are infringing?

6               MR. THORNBURGH:  No, no witness used the word

7       "class," but the witnesses described the class more

8       factually as the people who did the importing in response

9       to Fairchild's actions.

10              THE COURT:  Have you cited any cases that talk

11      about the inducement of the defendant being directed to

12      another indirect infringer as opposed to directed to the

13      direct infringer?

14              MR. THORNBURGH:  I believe that is actually my

15      next slide.

16              So this is not a subject that has come up a lot

17      in the cases.  Looking back at the statute itself, 271(b),

18      it says inducing infringement.  It doesn't say inducing

19      direct infringement.

20              And I think everyone agrees, both the parties,

21      that direct infringement must occur for any type of indirect

22      infringement to occur.  But the question is whether you have

23      to induce the direct infringement or you can induce someone

24      else to induce the direct infringement, and there is really

25      not a case on that point.

1          That if you go back and look at the case that

2     Fairchild cites, *Crystal*, it does say you have to induce

3     direct infringement.  But that was not at issue on the facts

4     of that case, and *Crystal* actually affirmed inducement for

5     other reasons.

6          But if you look at what *Crystal* cites, it's

7     *Micro Chem*, and I have a cite here from 103 F.3d at 1549

8     which we think states the test more accurately.  There can

9     be no inducement to infringe absent direct infringement.

10         So saying that you have to induce direct

11    infringement, we think was slightly inaccurate shorthand,

12    because the statute says you have to induce infringement.

13         But even if Fairchild is right on the law, we

14    would say that because the ODMs and the OEMs are so closely

15    related as partners and that the ODMs are the OEMs

16    subcontractors that the Court really wouldn't even have to

17    reach this legal question because when Fairchild induces the

18    people who are the agents of the OEMs, that that would be

19    enough.

20         The District Court case from Connecticut that

21    Fairchild cited is the *Jacobs* case.  We think the facts are

22    quite different and, of course, it is not binding but

23    notably in that case, and I cite at 424 F.Supp. 2d at 394.

24         The allegation in that case was that one company

25    induced contributory infringement by another company.  And

1    so that was the point, the District Court said that it

2    wasn't sure that that was an even adequate legal obligation

3    but then it goes on to actually look at the facts anyway

4    and finds that the accused party, Danaher, had taken no

5    affirmative action to induce the other company to infringe.

6              And, of course, there is substantial evidence

7    that the jury heard in this case that Fairchild took lots

8    of actions to cause both the ODMs and the OEMs to infringe.

9              So we believe that the jury has absolutely seen

10   evidence on all four elements and that therefore the verdict

11   is induced infringement must be upheld.

12             I'll note that the volume of infringement will

13   be addressed by Mr. Warden.  That is a damages issue, it's

14   not a liability issue.

15             There could be no question some direct

16   infringement and some inducements occurred, unlike the

17   *PharmaStem* case that Fairchild cites in their reply.

18             There is no question on the verdict form to

19   quantify the volume of infringement.

20             The *Lucent* case that they cite in their reply

21   actually affirmed inducement even though -- based on

22   circumstantial evidence of use, even though damages didn't

23   survive in that case.  And the Court has already ruled that

24   this case is different from Fairchild I.

25             So unless the Court has more questions on the

1    four elements, I'll turn to 2014.

2              THE COURT:  That's fine.

3              MR. THORNBURGH:  So the evidence put on in 2014

4    as Fairchild stood up this morning and said, that was there

5    was no evidence at all that anything changed in 2014.  You

6    know, there might have been such evidence if certain of that

7    evidence was excluded, certain of that evidence Fairchild

8    chose not to present.

9              They couldn't tell the jury that they stopped

10   direct sales to the U.S. after 2014.  They didn't actually

11   tell them that.

12             THE COURT:  So I haven't ruled that that would

13   have been excluded.

14             MR. THORNBURGH:  I don't believe Your Honor

15   excluded that one fact.  Your Honor excluded the customer

16   letters and the injunction.

17             But the evidence that was presented to the jury

18   -- and Fairchild is wrong that there is just no evidence

19   after 2014, the evidence that was presented is that the

20   sales continued.  The Fairchild sales database shows sales

21   after 2014.

22             And given all of Fairchild's efforts to make

23   sure that those sales reached the United States, the jury

24   was entitled to infer that nothing changed.  It kept on

25   going.

1              And we did actually introduced testimony again

2     from Mr. Lam as of 2012 and that trial.  That as of then,

3     there was nothing changed.  That they were continuing to

4     sell.

5              And so the jury was entitled to infer that --

6     from just the amount of evidence that was in the record that

7     nothing changed.

8              The last thing I will address briefly is law of

9     the case.

10             We briefed this a couple of times.  I won't

11    belabor it.  But after the 2012 trial, the Federal Circuit

12    ruled that inducement is a factual issue for the jury if

13    they are properly instructed.  And the Court, this Court had

14    already agreed and denied Fairchild nearly identical JMOL

15    after the 2012 trial.  And so basically when the Federal

16    Circuit affirmed that denial of JMOL and remanded, it

17    remanded for a new trial, not for another JMOL.

18             Fairchild makes no efforts to distinguish the

19    facts.  Our evidence this time is actually better.  They

20    haven't identified any evidence that was excluded.

21             And they say, well, the 2012 verdict was

22    vacated.  You can't get law of the case from that.  And, of

23    course, that is right.  What we're getting law of the case

24    from is the denial of JMOL and the affirmance of the denial

25    of JMOL.

1              Their cited cases are not to the contrary.

2              The *Pannu* case in their reply doesn't even

3       mention law of the case.

4              They cite to *Engel,* we actually agree with.  It

5       says issues actually decided on appeal are foreclosed from

6       further consideration.

7              This issue, whether inducement is for the jury

8       was actually decided.

9              And as far as the MSJ and the *Daubert*, we're

10      not saying that those are literally binding.  The Court is

11      permitted to change its mind, but Fairchild has not given

12      Your Honor any good reason to do so.

13             So with that, I will stop.  Thank you.

14             THE COURT:  Thank you.

15             Good morning.

16             MR. WARDEN:  Good morning, Your Honor.  Joseph

17      Warden.

18             I'll be addressing damages.  I have an

19      additional set of slides with respect to damages.

20             THE COURT:  You can pass that up.

21             (Documents passed forward.)

22             MR. WARDEN:  Your Honor, with respect to

23      damages, I do think that the majority of the issues raised

24      in Fairchild's motion are issues that the Court already

25      addressed in *Daubert* and are unchanged.

1              One exception and where I'll begin is the issue

2     of the jury having awarded Power Integrations more than

3     what we asked for.  And as the Court noted, and I think as

4     Mr. Olson agreed, there is no legal impediment to that.

5     Certainly if the jury concluded that there was evidence

6     supporting more damages than what we asked for, then the

7     jury was empowered to award more damages than what we asked

8     for as a legal matter.

9              So the question for the Court is, is there

10    substantial evidence to support the jury's award of damages?

11             And the answer is there is.

12             And the reason there is, is because there was

13    evidence in the record which would allow the jury to use

14    both a higher royalty base than what Mr. Barnes had

15    identified and also evidence that would allow the jury to

16    use a higher royalty rate than what Mr. Barnes identified

17    and I will talk about both of those.

18             First, with respect to the royalty base.  There

19    was substantial evidence in the record that would support an

20    importation rate of up to one-third.

21             I know they've got issues they raised that I

22    think are identical to what they raised in the *Daubert*

23    about using estimates in general and I can address those

24    later.  But to the extent estimates were used, there was

25    the evidence, the testimony of Mr. Balakrishnan and

1   Mr. Sutherland that one-third of products come into the

2   United States.

3            There was also even more than what had been

4   identified in summary judgment on this matter or, excuse me,

5   the *Daubert* on this matter because the testimony came out at

6   trial that other experts on behalf of both parties in other

7   cases had independently concluded that up to a third of the

8   parties products come into the U.S.

9            Mr. Handfield talked about having reviewed the

10  testimony of Fairchild's expert, who is actually

11  Mr. Malackowski in another case in which Mr. Malackowski

12  concluded that one-third is the right importation he used.

13           Mr. Schoettelkotte talked about how having

14  reviewed Mr. Troxel's testimony, it was 30 to 33 percent.

15           And then there is also what we talked about,

16  Mr. Shah's testimony between 20 to 30 percent.

17           And Mr. Barnes' calculation of 30.2 percent.

18           And so while the jury could have gone with the

19  30 percent that Mr. Barnes asked for, there was enough

20  evidence for them to use a 33 percent importation rate.

21           THE COURT:  Was there sufficient evidence to

22  support 34 percent?

23           MR. WARDEN:  Your Honor, 34 percent, I haven't

24  identified anything that would be 34 percent.  And so we

25  have agreed that the Court also has to look at whether there

1     is sufficient evidence for them to have used a higher

2     royalty rate, which there was.

3          THE COURT:  Just to be clear, there is not

4     sufficient evidence to support finding of 34 percent.  I

5     mean 33 and-a-third would be the highest.

6          MR. WARDEN:  I would agree with that, Your

7     Honor.  We haven't identified anything that would say

8     34 percent.

9          So let's talk about the royalty rate then.  As

10    the Court recalls, and Mr. Olson talked a little bit about,

11    the way Mr. Barnes arrived at his royalty rate was looking

12    at these Product Selector Guides.  And they have a range or

13    they had a number of different features of the Power

14    Integrations products, and they put a value on those

15    features.

16         And for jitter, it was valued somewhere between

17    $0.03 and $0.20 depending on the power level of the chip the

18    jitter was being used in.  And Mr. Barnes, using a weighted

19    average of the Power Integrations products, arrived at $0.09

20    as sort of the average value of jitter in the Power

21    Integrations chips.

22         Now, Mr. Sutherland, who was one of the

23    witnesses for Power Integrations who actually goes out and

24    works with customers and talks to customers about how they

25    use Power Integrations and what value they find in Power

Integrations products, specifically testified that these

Product Selector Guides underestimate how valuable jitter

is, and one of the ways he identified it is he said these

Product Selector Guides are aimed at medium sized and large

customers.

But if you have a small customer, which a lot of

Power Integrations are, they'd actually get more savings

because they're not buying in bulk, they're not getting bulk

discounts, and so they could actually save even more than

the $0.09 that Mr. Barnes had identified.  That is one way

the jury could have found that the rate could be supported

more than $0.09.

A second is, as I just mentioned, the Product

Selector Guide identifies between $0.03 and $0.20.  $0.20

is the amount that you save in high power chips used in high

power products.

And as we pointed out in our brief, there is

testimony from Fairchild's own witnesses that says, while

Power Integrations tends to sell more in the lower power

area, Fairchild sells in the low power and high power.

Based on that, the jury could have concluded that the

savings for Fairchild, because Fairchild sells more low or,

excuse me, of the higher powered chips would have been

closer to the $0.20 than the $0.09 that Mr. Barnes identified.

And then, third, Mr. Barnes identified that the

profit margins for Power Integrations chips was $0.23.  He

said this is what Power Integrations is going to be

concerned about when they're sitting down at the

hypothetical negotiation is that they could lose up to $0.23

for every chip that Fairchild sells and he was asked.

Why wouldn't PI demand a royalty of $0.23 per

chip?

And his answer is that they might actually.  He

says that might be Power Integrations' position at the

negotiation is to ask for $0.23, and then the parties would

negotiate and they would probably arrive at something less

than $0.23.

Mr. Barnes ultimately concluded that number

was $0.09, but he certainly provided evidence from which

the jury could have concluded actually we think Power

Integrations would have asked for something even more.

And I think this case is actually very much like

the *Rite-Hite* case that we cite in our brief.  And we cite

it for the proposition that the damages aren't capped by

the defendants' profits.  But if you look at the facts of

*Rite-Hite,* what happened there is the Judge who was acting

as the -- he was awarding the damages in that case,

concluded that *Rite-Hite* would demand a royalty of no less

than one-half of the profits they stood to lose from any

product that their competitor sold.  And the reason the

1     Court said that was acceptable is because it showed that

2     *Rite-Hite* and the defendant were competitors in the market,

3     that the patentee had never licensed its product, that the

4     patentee knew it was going to lose sales if it did license

5     its product, and so it was okay to award up to half of

6     their profits even though that was more than anything the

7     defendant was making.

8                Here, what the jury, the jury did $0.10.  That

9     is still less than half of Power Integrations products.

10    There was sufficient evidentiary basis certainly for the

11    jury to go higher than $0.09, $0.10, even more than $0.10

12    and $0.10 by itself along with a 33 and-a-third importation

13    rate that gets you above even what the jury awarded.

14               So there is sufficient evidentiary basis for the

15    jury to have come up with the award that it did and no basis

16    for the Court to reduce that.

17               THE COURT:  Can you come up with any calculation

18    that gets the specific figure that the jury did and should

19    that be a concern of mine?

20               MR. WARDEN:  I don't think it is a concern of

21    the Court and, I can't tell you exactly how the jury did it.

22    There are probably an infinite number of permutations of

23    royalty rate and royalty base that could get the jury there,

24    and we don't know how the jury did it, but the question

25    isn't how did the jury do it.  The question is, is there a

1    sufficient evidentiary basis for them to do it?  And the

2    answer is yes.

3              The other issues in the motion I think have

4    already been addressed by the Court.  I can go through them

5    quickly or answer questions the Court has, but they're the

6    issues that were already raised with respect to the *Daubert*

7    motion from Mr. Barnes.

8              THE COURT:  Yes.  I don't know if you have more

9    to say in damages context about the post-July 2014 period

10   that could be viewed as damages.

11             MR. WARDEN:  I think it is also a damages issue,

12   but I would say the same thing that Mr. Thornburgh did.  And

13   actually I might just add then, in Mr. Thornburg's slides

14   there was a Slide No. 20 that he had put up, and I don't

15   have those slides in front of me.

16             THE COURT:  I do have them.

17             MR. WARDEN:  But if you look at Slide No. 20,

18   he had put up to show all the things that Fairchild does to

19   induce infringement before a product is ever sold, like the

20   UL certification in the design which is working with

21   customers.  All of this -- all of this happened before July

22   of 2014, and it didn't get undone at any point.  All the

23   things that Fairchild had done to induce infringement had

24   already happened.  It already designed the chips so they

25   could be sold into the United States and their continued

1    sale into the United States was still the result of

2    Fairchild's induced infringement.

3                THE COURT:  I think the defendants are asking me

4    to reduce the verdict by about 10 percent solely to account

5    for the post-July 2014 period.  Is that your understanding?

6                MR. WARDEN:  I think it is something around

7    10 percent is what they had said, yes.

8                THE COURT:  So we all know what happened after

9    July 2014.  I didn't let the jury really be told, but if I

10   were to look at all of that data of whatever sales there

11   were or were not and importation there was or was not based

12   on the evidence that we all know, could it support that

13   10 percent amount of the verdict for that period of time?

14               MR. WARDEN:  If I am understanding the Court's

15   question, is there sufficient evidence to support that,

16   that 10 percent of the verdict was induced by Fairchild?  I

17   would say the answer is "yes" based on what they had done

18   before July of 2014.

19               THE COURT:  10 percent is something like $2

20   and-a-half million, something like that.  Is there evidence

21   that we have -- not the jury but that we have that there

22   were anything near $2 and a half million of Fairchild

23   products infringing that were imported into the U.S. after

24   July 2014?

25               MR. WARDEN:  So if the question is do we have

1    the evidence that that is how much of the imported products

2    came after July of 2014, I think we agree with Fairchild on

3    the math that it was approximately 10 percent of the jury's

4    verdict related to products that were imported after July of

5    2014.

6              Have I answered the question?

7              THE COURT:  It's a poorly asked question, but I

8    think you have, yes.  Thank you.

9              MR. WARDEN:  Would you like me to address the

10   issues raised?

11             THE COURT:  It's really up to you.

12             MR. WARDEN:  So let me -- on the importation

13   rate, I don't think I'm going to other than I just would

14   like to direct the Court to one point that I think didn't

15   come out during the earlier argument about distinguishing

16   the *Carnegie Mellon* case, which we primarily rely on, saying

17   industry data sources are fine for an estimate from what the

18   Federal Circuit had done in the first F-I case back in 2013.

19             *Carnegie Mellon* specifically discussed the

20   *Power Integrations* case, and it distinguished it, and it

21   distinguished it on the ground that it described the *Power*

22   *Integrations* case as being a lost profits case.

23             And Fairchild will tell you there was a small

24   component of Mr. Troxel's opinion that related to reasonable

25   royalty, but the Federal Circuit discussed it in terms of

1    lost profits.  And as the *Carnegie Mellon* Court said:

2    "There are significant conceptual differences between ...

3    what agreement the parties would have reached to value a

4    defendant's use of the patentee's technology (reasonable

5    royalty)" and what they could have proven with respect to

6    lost profits.

7              So when you're talking about a hypothetical

8    negotiation, we don't need the same sort of precision you

9    need for lost profits because you are talking about what

10   would parties who don't know everything have agreed to in

11   a negotiation.  That is at least one of many ways to

12   distinguish Power Integrations.

13             On the royalty base, the only thing I want to

14   address is this idea that Mr. Balakrishnan -- or, excuse

15   me, on the royalty rate, that Mr. Balakrishnan had said 85

16   percent of the value of our chips comes from some other

17   feature.

18             This evidence was presented to the jury.  The

19   jury heard all about that, and Mr. Balakrishnan explained

20   that the fact that there are other valuable features in our

21   product doesn't impact the value of jitter.

22             If you add other features, you take away other

23   features, it doesn't change you how valuable jitter is.

24             Excuse me.  This is Mr. Sutherland's testimony

25   saying this.

1           Mr. Balakrishnan said the same thing.  It has

2     the same value because it saves components and, therefore,

3     it always has the value independent of the other features.

4           The cost savings is always going to be the same.

5     And this is why actually Mr. Barnes explained he used a

6     per unit royalty rather than a percentage royalty.  He

7     identified the value as $0.09, and it is always going to be

8     $0.09 whether you add EcoSmart take out EcoSmart.  Whether

9     you change the products up or down, it's always going to be

10    $0.09.

11          So what Mr. Barnes did was specifically

12    apportioned to the value of the technology unchanging

13    regardless of what other things are added to or taken away

14    from the product.

15           With that, I have no other questions unless the

16    Court has.

17               THE COURT:  Okay.  Thank you.

18               Back to Mr. Olson.

19               MR. OLSON:  I will be fairly quick.  I am going

20    to address specific points before sitting back down in order

21    to save time around the question of enhancement.

22          Let me start on the inducement question.

23          First, is there any case that has said inducing

24    indirect infringement satisfies 271(b)?

25          The answer is no.  There are a number of cases

1    that have said the contrary.  The District of Connecticut is

2    one case.  We believe *Crystal* says inducement requires that

3    the defendant induced the third-party direct infringer.  We

4    think that is conclusive on the point.

5           There is no case that the Federal Circuit or at

6    the District Court level that has ever said it is okay it

7    satisfies 271(b) to induce indirect infringement.

8           THE COURT:  But the 271(b) doesn't call out

9    direct infringement, does it?

10          MR. OLSON:  The 271(b), the language itself does

11   not call out direct infringement.  The Federal Circuit cases

12   interpreting 271(b) call out direct infringement.  That

13   there must be inducement.

14          THE COURT:  Well, I don't think, but correct me

15   if I'm wrong, I don't think they specifically addressed the

16   question of whether under 271(b), you have to induce the

17   direct infringer.  Clearly, they say there has to be some

18   direct infringement.  Right?

19          MR. OLSON:  Oh, I apologize.

20          THE COURT:  Well, I missed it if you cited a

21   case that says other than the District of Connecticut, the

22   Federal Circuit case I'm asking about.

23          MR. OLSON:  Sure.

24          THE COURT:  That says the inducement has to be

25   of a direct infringer.

1              MR. OLSON:  Sure.  So certainly the District

2    of Connecticut case does.  I agree that is not a Federal

3    Circuit case.  We believe *Crystal* does say that and indicate

4    that, although I agree that that was not in that sense the

5    question presented as you might present it on a petition for

6    cert.

7              And, three, we believe that actually the ruling

8    about causation in this case, the 2016 Federal Circuit

9    opinion which says there must be causation, i.e. successful

10   communication with the direct third-party infringer, is

11   itself an indication by the Federal Circuit that that is a

12   requirement.

13             However, the one thing I would say is this.  If

14   the Court believes the issue here is that there was

15   inducement of indirect infringement, the only thing I would

16   ask is that the Court make that clear by way of its opinion

17   so that that issue can be fully and clearly addressed by way

18   of the Federal Circuit.

19             Whether or not it's precluded or not precluded

20   by prior opinions, we think it would, but we believe that is

21   an important question to at least set up directly with the

22   Federal Circuit.

23             We take on the question of class.

24             Mr. Thornburgh comes up and says that it's

25   everyone who infringes.  That is the class, everyone who

1    infringes.  There is certainly no evidence presented

2    regarded that issue.  He said that in the trial.

3              That wasn't what was said in closing.  There has

4    been no effort to show what was said in closing is accurate

5    or would satisfy the verdict.

6              And *Dynacor* says that if you rely on a class,

7    you have to show that every element is necessarily met.

8    In fact, *Dynacor*, which is the case that says you can use

9    a class, finds that there was no induced infringement

10   because there is circumstances under which the class does

11   not necessarily infringe.  If you use a class, there is

12   necessary infringement.

13             There was a reliance on Mr. Lam's testimony that

14   some products come in, but that doesn't address the full

15   scope of the verdict and, moreover, Mr. Lam's testimony 533,

16   17.

17             When asked:  Do you have any idea how many

18   products come to the United States?

19             He answers:  Very, very minor.  I would say five

20   percent generally.

21             That certainly doesn't get us to where we're at

22   here.

23             On the question of causation, there is the

24   argument that their subcontractors -- so, first of all, I

25   actually did not hear in the presentation any identification

1    of an actual successful communication by Fairchild to the

2    party who did the third-party direct infringement.  What

3    they instead argue is they're subcontractors, and then it

4    was actually a statement they're agents of.  Somehow as

5    those as a lawyer/client relationship or agency

6    relationship, a real estate agent.

7              That is clearly not what was discussed within

8    the subcontractors.  The idea of subcontractors here is

9    simply suppliers.  Someone else who makes a product who

10   sells it to someone else who produces it.  A screw would be

11   an agent in this context.

12             Being a subcontractor does not make you an agent

13   of.  And there is no suggestion that the ODMs are agents.

14   Never an argument on agency.  And certainly it isn't an

15   argument that these ODMs are in such close relationship

16   that they are themselves the OEM, which is of course what is

17   required for an agency relationship.

18             Volume is a liability issue.  The 2013 case

19   tells us that.  That if you cannot show that this amount of

20   product entered the United States, up to the full scope of

21   the claim they're making, you do not have evidence

22   sufficient for inducement.

23             On July of 2014, there is an argument that we

24   could somehow put in evidence regarding our efforts to

25   stop the shipment of the product into the United States.

1               But the shipment of product directly by us into

2       the United States doesn't address the inducement issue,

3       doesn't address the evidence that needs to be.

4               The Court said we can't mention the injunction,

5       we can't mention the customer letters.  And the customer

6       letters are the manner by which we told people do not use

7       these products in the United States.

8               The customer letter attaches the document, the

9       datasheet that says on it do not use these products in the

10      United States.

11              There was no way in which we could, without

12      violating the Court's order, address that evidence.  And

13      there is, in any event, no reason to infer that because of

14      something said in 2011 or 2012 that all of the conduct after

15      2014 is a direct -- is induced infringement.

16              Let me address the amount issue.

17              10.4 percent is the amount.  It is reflected in

18      our calculations and was not contested, but even more so,

19      Barnes's declaration itself on prejudgment interest places

20      the same 10.4 percent.  If you back it up, what does the

21      same thing.

22              So he is using worldwide sales.  We actually

23      think that is a problem but it confirms the 10.4 percent.

24              Let me deal with damages.  I've already

25      addressed the 33 percent evidence, and why we don't think

1          that is satisfactory.

2                    The argument that roughly about one-third and

3          that it applies to all products does not demonstrate how

4          either that connects to a class, or that it connects to

5          these products, or that it connects to the infringing chips

6          themselves which are a requirement under the 2013 case, the

7          scope and requirements of which were not discussed in the

8          presentation a moment ago.

9                    On the higher rate on the $0.20.  What the $0.20

10         speaks to or addresses is the question of when you took the

11         material from the Product Selector Guide, and this is just I

12         can put it up here, but it's got -- I know Your Honor has

13         seen it and looked at it before.  It says built in frequency

14         jitter up to $0.03 of savings.  Then it says, for instance,

15         jitter simplifies up to $0.20 of savings.  Here, these

16         specific implementations doesn't apply to the rest of the

17         implementations even in the very document, and there is no

18         indication that that would be what anyone would demand or

19         believe was a proper royalty.

20                    There is no evidence that it is a proper

21         royalty.  There is no evidence by Mr. Barnes that it was a

22         proper royalty.  The testimony that was put up said, yes, I

23         agree they have a margin point defense.  They might want to

24         demand $0.23, but the royalty, the outcome of a hypothetical

25         negotiation would be $0.09.  There is no evidence that the

1    outcome of a hypothetical negotiation would be more than

2    $0.09, and in the absence of that, the verdict cannot be

3    confirmed.

4              I also do think that it is a problem that we do

5    not know how the jury achieved this number.  Very specific

6    number.  It would involve some sort of calculation.  They

7    don't have an answer for it.  We certainly don't have an

8    answer for it.  None of the hypotheses about combinations

9    of numbers match it exactly.  It is beyond the scope of the

10   evidence, and it is beyond what the evidence can bear even

11   by reasonable inference.

12             It is not that there is a per se bar but there

13   must be evidence in support of it, and that is even apart

14   from accounting for the July 4 -- excuse me -- the July 1,

15   2014 problem.

16             And let me just take that as the opening to say

17   something on a closing comment with respect to this issue.

18             The argument is, on damages or to support this

19   verdict, all we have to show is importation.  That is

20   repeated.  That comes back repeatedly.

21             They say 33 percent importation rate.  Not

22   inducement rate, not evidence of inducement, not who is the

23   people who bring it in and how they're connected to any

24   affirmative act by Fairchild but just importation rate.

25             That the beginning of the enhancement brief says

1    there wasn't steps to show that it would not reach the

2    shores of the United States.

3           The argument as to 2004 is there is evidence

4    showing that there would be other product coming back to the

5    United States after -- 2004 I said, but 2014 coming back.

6           Evidence that product came to the United States

7    is insufficient.  By definition, under the Federal Circuit

8    cases, you have to show induced infringement as to the full

9    scope of the claim; and to do that you have to show all four

10   elements, one of which is both an identification of who

11   brings it in -- because DSU says you must show direct

12   infringement for each induced infringement.

13           *Dynacor* says you can prove it as to a class but

14   then you have to prove the full scope of the class.  There

15   was no evidence of class, and no evidence that any class can

16   satisfactory all this.

17           And then you must have evidence of a causation,

18   i.e., a successful communication that goes from the defendant

19   to the infringer.

20           There was an argument that you don't need to

21   address successful communication.  You left it out of the

22   jury instructions here.  *Takeda* had it in.  *GlaxoSmithKline*

23   had it in.  Other courts have had it in.  Nobody has, and

24   the Federal Circuit decision doesn't allow you to read

25   successful.

1              And then even if you don't use the word

2     communications, successful contact, successful movement by,

3     inducement by, activity from the direct -- from the inducer,

4     the defendant, to the direct infringer, and that is not

5     present in this case.

6              So we think those problems inheritable both in

7     the liability verdict and in damages, that therefore there

8     should be JMOL, but if not, a new trial motion and

9     nonetheless at least a remittitur.  The remittitur, just for

10    the benefit of the Court, we put this in our papers, would

11    be from $24 million down to the Barnes number, $21 million,

12    high as 10.4 percent would be $19.6 million if these

13    calculations are there.  And we believe there needs to be an

14    accounting for the apportionment problem but we get at least

15    $19 and then address that.

16              THE COURT:  Let's talk just for a moment about

17    their slide 20, which we have all seen, but I'm showing it

18    to you --

19              MR. OLSON:  Sure.

20              THE COURT:  -- which basically is their theory

21    of the case I think is largely the inducing, the things you

22    did to cause, to communicate, to ultimately result in

23    infringement in this country, it happens to the left of the

24    line, but it does happen, and we can't ignore the jury

25    thought there was sufficient -- the jury thought those

1   things happened and that they met the elements of induced

2   infringement.

3           Is your argument that evidence didn't come in,

4   they couldn't believe that evidence or that that whole legal

5   theory just never should have been permitted to go to the

6   jury, or some combination of that?

7           MR. OLSON:  Well, actually I think none of the

8   above.  With the policies, Your Honor, I think, and I will

9   use this for a moment to try to address it.  But what do I

10  say the problem is?  The problem is it doesn't address the

11  question of connection to the direct infringer, and it

12  doesn't address the question of class.  And let me see if I

13  can show you why.

14          So I'm not sure whether -- the jury was

15  instructed on class and was instructed that you have to find

16  all elements.  It's just that at the end of the day, that

17  instruction, though accurate, was not satisfactory by the

18  evidence presented.

19          Now, let's take this specific example.

20          THE COURT:  Okay.

21          MR. OLSON:  Power Integrations meets with a

22  party for purposes of design and that party, according to

23  this, is going to do the UL listing.

24          Well, the evidence in this case is the person

25  doing the design and the person who obtains the UL listing

1    is the ODM.  In fact, there is literally no evidence in any

2    of the Fairchild documents referring to UL at all, at all,

3    none.  They relied on other standards, but there is no

4    evidence about Fairchild talking about UL.

5              In fact, Mr. Sutherland says that it's the ODMs

6    that is getting UL certification, but this is all ODM

7    activity, and design win is design win with the ODM, and

8    then you sell the integrated circuit to the ODM.

9              So here we have a bunch of activity with the

10   ODM, but where is the evidence that the ODM ever is a direct

11   third-party infringer?  There is none.  There is none.

12             There just literally is none.  There is no

13   evidence about how importation, no evidence about how there

14   is a third.  No evidence about how any of the other numbers

15   relate to the activities of the ODM.  This is all ODM

16   activity.  And what is left off the remainder after the

17   design win occurs, and after the sale occurs, then the ODM

18   makes the power supply.  And the ODM then ships that off to

19   other people.  And those people ship it off to other people,

20   at least we think from the evidence, and some combination of

21   those people are the direct infringer.

22             None of this is happening with the OEM.  None

23   of this is shown by the evidence to happen with the OEM.

24   The OEM is saying I've got a specification I'd like someone

25   to make.  I'm going to send it out to multiple ODMs.  Those

1      ODMs backing it up, those ODMs back up to Fairchild and have

2      the discussion.

3                    So the evidence here shows connection to the

4      ODM, but the ODM is not the direct third-party infringer.

5      That is the fundamental problem because then what we're

6      really saying is we're inducing further indirect infringement,

7      and we think that is at fundamental error.

8                    So I feel like I went well beyond what the Court

9      was asking for on this, but that is our view on it.

10                   THE COURT:  Okay.  Is there anything else you

11     want to say on your motion?

12                   MR. OLSON:  No, Your Honor.  I reserve for the

13     enhancement motion.

14                   THE COURT:  Mr. Warden.  Mr. Thornburgh, is

15     there anything further you want to add?

16                   MR. THORNBURGH:  Nothing unless Your Honor has

17     questions.

18                   MR. WARDEN:  No, Your Honor.

19                   THE COURT:  Then I guess we will move on to

20     Power Integrations's motion.

21                   Good afternoon, I guess it is.

22                   MR. SCHERKENBACH:  Good afternoon.  Yes.

23                   I had a few slides also.  I think they have

24     been handed up, I hope.

25                   THE COURT:  I do have your slides.  Yes.

1              **MR. SCHERKENBACH:  Okay.  Great.**

2              **So our motion, there are technically three -- I**

3      **need to switch over here.  There are three issues, Your**

4      **Honor.**

5              **I'm going to talk almost entirely about the**

6      **enhancement piece.  I'll have one word on attorney fees, and**

7      **I don't really intend to address interest unless you have**

8      **questions about it.  We'll rest on the papers for that.**

9              **A couple of things about -- first, let me just**

10     **jump into enhancement and treble damages on the legal standard**

11     **which I know you are well aware of.  It's discretionary, of**

12     **course, as you know.**

13             **The legal standard has changed since the last**

14     **time you assessed enhancement between these parties.  And it**

15     **again bears some emphasis.**

16             **So when you did your analysis in the first case,**

17     ***Halo* hadn't come out yet, of course, so you were laboring**

18     **under a much more exacting standard.  There was required to**

19     **be a showing of objective recklessness.  That is gone.**

20             **The burden of proof was at that time clear**

21     **and convincing evidence, and now it is not.  It is a**

22     **preponderance.**

23             **Those two changes together are very significant**

24     **I think in your analysis this time around.  So that I think**

25     **bears some repeat.**

1              The second thing legally that I think is

2     particularly important is the Federal Circuit has said, in

3     the *WBIP* case and others, that where there are factual

4     components that are relevant to your enhancement analysis

5     that overlap willfulness -- and there are many, many, many

6     here that do -- those are jury questions that you're not

7     free to revisit, or roam, so to speak, in the enhancement

8     context, and there is no reason you would or you should.

9     But you have to be real careful to respect the findings the

10    jury made on willfulness and frankly also in this case on

11    inducement to the extent they relate to enhancement because

12    there is a mental state of inducement as well.  You have to

13    take all that as given in the enhancement analysis, in the

14    way you did in the *Idenix* case which you were very careful

15    to do.  It's really the same analysis.

16             So with that, as sort of the legal framework, I

17    wanted to talk about some of the key facts overall and then

18    touch on just a few of what I think are the most important

19    *Read* factors this time around.  So, of course, the jury

20    found willfulness, and that is the predicate here to our

21    request.

22             And it is, when you ask yourself at a high level

23    why does this case stand out?  Why does this case call for

24    enhancement?  I mean the first factor to really I think

25    focus on, this is a repeat willful infringer of the same

1    patents.

2              That is a highly relevant fact.  It is a highly

3    unusual fact, frankly.  And it is something you need to take

4    into account in deciding what to do here.

5              The timing also is very, let's say, interesting.

6    Fairchild acquired SG almost immediately after losing the

7    verdict in the first case.  There certainly is at least an

8    inference they did that because they needed to replace the

9    products that were found to infringe in that case with other

10   products.  And yet there is no evidence anyone at Fairchild,

11   anyone at Fairchild, any decisionmaker at Fairchild believed

12   those new SG products, which they bought, they had to have

13   jitter products.  There is no evidence anyone at Fairchild

14   didn't believe those products didn't infringe.

15             I'm going to come to their new declaration with

16   all that, but that is the fundamental issue, right?  You are

17   talking about the mental state of the company, Fairchild.

18   They had no reason to think that this new business they

19   were buying was going to be any more clear of the patents

20   than the one that had just been found to willfully infringe.

21             THE COURT:  So on those fundamental questions

22   that you are emphasizing, is that for the jury or is that

23   for me?

24             MR. SCHERKENBACH:  I actually think it's both.

25   I'm not trying to be cute, but I think the jury heard evidence

1    that touches on some aspects of that, but at the same time you

2    know certain things about the prior case the jury did not.

3    They certainly know, the jury certainly knows the key point,

4    which is that no Fairchild decisionmaker had any reason to

5    think that these SG products didn't infringe.

6            THE COURT:  Right.  But I don't recall the

7    timing of the acquisition relative to what happened in

8    the earlier case.  Did we tell the jury about that?

9            MR. SCHERKENBACH:  Yes.  So the acquisition

10   closed in early 20 -- excuse me -- 2007.  I believe it was

11   either late January or early February 2007.  We can get you

12   the date.  The jury verdict was in December of 2006, so it

13   was really almost bang-bang.

14           THE COURT:  Is that something we told this

15   latest jury?

16           MR. SCHERKENBACH:  No, right.  So this jury, we

17   have excluded prior litigation for obvious reasons.  But

18   you, of course, know that.  And to the extent that bears

19   on their state of mind in the enhancement analysis, that is

20   something that you can take account of.  So that is sort of

21   where we begin is sort of the overall or overarching fact

22   pattern.

23           Then on this good faith issue, which I want to

24   spend some time on, I'm going to come back to it in a couple

25   of contexts, this case is very unusual because there is no

1   evidence whatsoever from a Fairchild decisionmaker that

2   they believed they were in the clear at all.  Right?

3             In fact, none of the decisionmakers even read

4   the patents.  Do they have to read the patents?  Not

5   necessarily if they're relying in good faith on somebody

6   else who did and who advised them.  That evidence is not

7   in the record, so you have here people who didn't rely on

8   anyone else, and they didn't do their own homework.  Those

9   are the two options they have, and they didn't do either

10  one.

11            We have, in this case -- and I'll touch on this

12  a couple of times, too, Your Honor.  The record here is

13  actually a bit different and even more complete than in the

14  first appeal to the Federal Circuit, if I can put it that

15  way, in this case.  For example, Mr. Ullal's depo testimony

16  was read to the jury.  That wasn't in the first case.  It's

17  now in this case.

18            He basically said don't talk to me about

19  litigation.  I don't know anything about it.  I don't want

20  to know anything about it.  It's a distraction.  He was the

21  responsible decisionmaker for a significant part of time.

22            There were two others as well, Mr. Shah and Mr.

23  Chiang.  Neither of them ever had a good faith belief either.

24            The corporate representative they brought to

25  the trial, a perfectly nice man, Mr. Hertz, had nothing to

do with these products.  They weren't even in his business

unit.  And that is the person that came and had talked to

the jury about Fairchild.  And he, of course, didn't testify

to any good faith belief either.

No opinion of counsel in this case, which there

was in Fairchild I.  There were all sorts of problems with

those opinions, but at least they tried, and yet you ended

up properly so enhancing in that case where they don't even

have an opinion.

No design-around that was commercialized.  They

tried to design-around.  There was some work on design-around

parts.

No evidence in this record, in this trial

record that they were ever commercialized.  And indeed to

the contrary, they kept selling.

All along they kept selling.  And I'll come back

to this after the injunction.  They kept selling.

All right.  And then, of course, the W.H. Huang

testimony, which they tried to take back, I'll come to that,

but he clearly admitted that within six months or so of this

complaint being filed, no more than six months of this

complaint being filed, the technical people at SG realized

that they had no infringement defense in this case.

We can talk about his declaration and what you

are going to do with that and whether you should do anything

1    with it, but the record, the evidence that the jury heard is

2    that.

3                 So with that, let me just talk to, I think I

4    want to just talk to maybe three or four of the *Read*

5    factors.  I'm not going to go through them all mechanically.

6                 There is unrebutted evidence of copying in this

7    case.  It's a bit different than there was in the first

8    case.  It's of a different character than it was in the

9    first case.  But we put on evidence of the side-by-side

10   comparison of the schematics.  Our expert talked about that

11   and said basically the similarity is striking.  All they

12   have done is replace current sources with capacitors.  That

13   is a trivial technical change, really means nothing in the

14   context of the circuit.

15                And Dr. Baker, Fairchild's expert, had nothing

16   to say about that.  Nor did any Fairchild fact witness have

17   anything to say about that ... until W.H. Huang submits a

18   new declaration after trial.  All right?  So, again, the

19   trial record has unrebutted evidence of copying.

20                Good faith, I touched on this already about no

21   one having any good faith belief.  Now, again they try to

22   take that back after the fact of Mr. Mr. Chiang's

23   declaration.  And I can address that later when I deal with

24   the new declarations.  But if you look at the trial record

25   that the jury considered, no evidence of good faith.

1          THE COURT:  On the copying.

2          MR. SCHERKENBACH:  Yes.

3          THE COURT:  Is it your contention that this is

4    relevant and attributable to Fairchild because, as you say,

5    they were found to be an infringer based on their own sort

6    of copying and then turn around and buy another copier, that

7    is one thing and/or is it that, hey, SG copied and someone

8    is on the hook for that copying and now Fairchild bought

9    them?  So is it something that Fairchild itself did or is

10   it just that they have inherited the copying that you say

11   SG did, or is it both?

12         MR. SCHERKENBACH:  It's both, if I understand

13   your question.

14         So their mental state is highly relevant to

15   copying the second time around where they -- "they" meaning

16   Fairchild -- were responsible for the copying in the first

17   case.  They buy SG who independently copied.

18         Now, they want to play this game about, well,

19   that was the Taiwanese company.  That was separate.  SG

20   and the first company that copied, well, that was a Korean

21   company we bought.  We're not really responsible for these

22   companies.  They're different companies.

23         Yes, they are responsible for them.  At the end

24   of the day, it actually doesn't matter.  I think, whether

25   the Fairchild decisionmakers themselves were aware of and

1     involved in the copying, they are legally responsible for

2     it.   They bought the company.   They did it at a time where

3     they had just been found willfully to have infringed based

4     on copying, among other things.

5                  So you would think, and the jury would have been

6     more than entitled to believe, they should have been extra

7     careful.   You know, don't do it again, guys.   And yet the

8     evidence is the SG engineers get together and realized,

9     well, that design we have, that is not going to work.

10                 And where is the evidence that any Fairchild

11    decisionmaker, in buying SG, actually cared, cared at all,

12    even asked the question?   There is no evidence of that.

13    Didn't even ask the question.

14                 All right.   Litigation behavior.

15                 This is all laid out in the briefs.   It's

16    obviously an important *Read* factor.   Your Honor is obviously

17    in the best position to assess this.   This is one of the

18    *Read* factors that the jury is not really, they don't make

19    findings on.   They weren't really presented with evidence

20    about litigation behavior.   This one is entirely in your

21    wheelhouse.

22                 We tried to direct for you here in the briefing

23    sort of a list of things that we think you might want to

24    think about.   You know, here we are 11 years after the case

25    was filed and we know, looking back, that they never thought

1     they didn't infringe.

2             We know their validity defense on the '851, it

3     was so weak they didn't even appeal it to the Federal

4     Circuit.  We know their trial validity defense on the '876

5     was 180 degrees opposite of what their expert in the first

6     days said.  They had to go out and hire another expert

7     in order to make the argument.  This was anticipation by

8     Martin which they went to trial on in this case.  And in the

9     earlier case, they didn't even make the argument.  They

10    didn't even claim there was anticipation.  So extraordinary

11    natural weak case on the merits that has taken 11 years to

12    get to this point.

13            Inducement issues.  They continued to

14    relitigate.  They relitigated here today.  With all due

15    respect to counsel, they continue to try to undermine the

16    Federal Circuit precedent which was reaffirmed on the

17    first appeal in this case that you do not have to have a

18    one-to-one correspondence between a specific communication

19    or act and a specific direct infringer.  I mean at the end

20    of the day, it really seems to be what they're arguing

21    still.  We have to point to, and not only that, it has to be

22    direct evidence of a specific communication to a specific

23    direct infringer.  Otherwise, you can't sustain the verdict.

24            They have tried that now, I don't know how many

25    times, repeatedly, and they repeatedly lost the issue, and

1    they continue to relitigate it, including here today.

2              Their trial defense, this, their whole supply

3    chain argument, Mr. Handfield, I'll just deal with those

4    two together, control and visibility were their watch words

5    at trial, control and visibility, which really had nothing

6    to do with the relevant legal standard.  We pointed that

7    out.  We pointed it out in the briefing.  It really isn't

8    a defense, but it was what they tried to present as their

9    defense.

10             Two of their witnesses who came live, Mr. Chan

11   and Mr. Chiang, contradicted their prior deposition

12   testimony.  We put that in the brief.  I won't repeat that.

13             I already observed they knew all along they had

14   no defense to direct infringement.

15             I commented on the weakness of their validity

16   defense.

17             I mentioned Mr. Hertz was not even involved with

18   the relevant business unit.

19             And now we have sort of the additional still

20   further fact of these new declarations which are remarkable.

21   I mean that is, in our view, not only does it not help them

22   but is a further example of just litigation misbehavior.

23             Okay.  The other, the last factor I would like

24   to single out and spend a little bit of time on because they

25   make something of it in their briefing is closeness of the

1    case.

2         In particular, they seem to suggest to you that

3    because the Federal Circuit opinion said that the evidence

4    of inducement was a close call on the record at that time,

5    that you're sort of foreclosed from deciding this time and

6    that the case was not close.  And I want to make a couple of

7    points about that.

8         No. 1, the Federal Circuit comment had nothing

9    to do with direct infringement.  It was made, it was

10   specifically in the context of inducement.

11        So, remember, in the first appeal to the

12   Federal Circuit in this case, they didn't even appeal direct

13   infringement of either patent.  Never challenged it.

14        Nor did the Federal Circuit comment have

15   anything to do with validity.  And I already commented on

16   the weakness of their validity case.

17        So direct infringement, validity, no one has

18   ever suggested their case was close, and certainly not the

19   Federal Circuit.  Okay?

20        In fact, if you actually look at the Federal

21   Circuit, the comments they do make about direct infringement,

22   the Federal Circuit did have some comments because that, of

23   course, was a predicate to inducement.  It wasn't an appeal

24   issue but it was predicate to inducement.

25        If you look at the opinion, for example, 843

1    F.3d at 1332 to 33, the Court describes the direct

2    infringement as essentially a slam dunk.  Fairchild doesn't

3    seriously contest, there is really no question about that,

4    language like that, underscoring it wasn't close.

5              Then the only other liability issue that the

6    Federal Circuit commented on the first time around was '876

7    validity.  If you look at that section of the opinion, no

8    suggestion that was a close call.

9              THE COURT:  But, of course, they're saying that

10   after a trial and years of litigation in this court, don't I

11   have to assess the full scope of whether it was ever close

12   even prior to trial?

13             MR. SCHERKENBACH:  You do.  You do.

14             THE COURT:  And this closeness, by the way, jury

15   has got nothing to say on that.  That is entirely for me.

16             MR. SCHERKENBACH:  I completely agree.  That is

17   an issue for you.  But I will just say, so, yes, again, you

18   are uniquely situated.  You have a lot more information.

19   But closeness on validity, for example, you do have

20   objective signposts that '851 validity, they didn't even

21   appeal.  And direct infringement, they didn't even appeal.

22             THE COURT:  But there is some tension there,

23   isn't there?  I mean you are hitting them hard for dragging

24   things out for 11 years but yet we can't be unhappy they're

25   not appealing everything.

1          MR. SCHERKENBACH:  Well, am I unhappy they

2    didn't appeal it?  No, but it isn't --

3          THE COURT:  I mean obviously it is an equitable

4    discretionary decision.

5          MR. SCHERKENBACH:  I agree with you.  I agree

6    with you.  I'll come back to this maybe in the context of

7    addressing what their arguments are, but just the big

8    picture point on validity is, of course, look at the

9    reexams, which they try to, of course, rely on, but one

10   independent claim that was infringed in each of the two

11   patents was never in reexam.  So I mean there are a lot of

12   objective things you can look at that line up with this

13   really was never a close case.

14          Okay.  So the Federal Circuit comment was

15   restricted to inducement.  Okay?  And it wasn't made on

16   this record.  So here is the other thing, and this is not

17   specifically cataloged in the briefing but I do want to

18   bring to the Court's attention or emphasize that there is

19   even more inducement evidence in this record than there was

20   the first time around.  Okay?  So even on this inducement

21   question specifically when the Federal Circuit previously

22   said it was a close call, that doesn't automatically apply

23   here.

24          There are at least three depositions read at

25   trial that were taken after the first appeal.  That W.H.

1    Huang, Vijay Ullal, and Giran Shah.  Those were all very

2    important on the issue of intent for inducement and mental

3    state.

4              There was a category, a whole category of

5    evidence on UL approval and Fairchild's role in helping

6    customers get UL approval.  That was not in the first case,

7    was in this case, involved testimony from Ben Sutherland and

8    our expert, Arthur Kelley, and a whole -- and a number of

9    exhibits related to that.

10             There was evidence here of work specifically

11   between Fairchild and the ODM Delta for an HP printer.

12             And there were, of course, the established facts

13   that were read to the jury, among other things.

14             So the record is different.

15             The last thing I will say on closeness, and I

16   will move on.

17             They say in their brief, I think, that because

18   the infringement finding for some of the products under the

19   '876 patent was a Doctrine of Equivalents verdict, somehow

20   that shows it was close.  Okay?

21             I don't really understand that for a couple of

22   reasons.

23             No. 1, there isn't any evidence that the DOE

24   analysis itself was a close call.  DOE infringement is

25   infringement.

1          And you have to take into account that Fairchild

2     itself all along never thought it didn't infringe.  I mean

3     there is no evidence that when the SG engineers got together

4     in 2008 after the suit was filed, they apparently weren't

5     sitting around thinking, oh, we have a pretty good defense

6     under DOE.  This is going to be a DOE case, right?  They

7     concluded they were going to -- they didn't have an

8     infringement defense.

9          All right.  Let me move on.  Let me go to the

10    injunction point because it has come up in a couple of

11    contexts now.

12          So this may or may not be helpful.  So Fairchild

13    raises this, their behavior in response to the injunction in

14    the damages context.  You just heard it this morning.  They

15    raised it in the enhancement context.

16          And I mean the first thing you observed is the

17    injunction came, of course, six years after the case was

18    filed.  So you have got a very long period of time where

19    this argument has come, no application at all.  But the

20    real punchline is here as, well, they never stopped selling.

21    Injunction or no injunction, they kept selling.

22          Now, their response is we didn't sell directly

23    in the U.S.  But that is not the point.  They never stopped

24    this.  Having set up as Mr. Thornburgh outlined and

25    described, having set up this business enterprise and this

1    machinery to ensure substantial sales in the U.S., they kept

2    right at it.

3           The jury saw evidence of that because they saw

4    evidence of the continued sales and sales data.  And there

5    was no testimony from Fairchild to this jury; and they

6    didn't, Fairchild didn't have to talk about the injunction.

7    They could have had a witness come and say, well, we stopped

8    selling or we changed our behavior in some way.

9           THE COURT:  They seem to be under the impression

10   that I wouldn't have allowed them to do that.

11          MR. SCHERKENBACH:  I don't think that is a

12   foregone conclusion.  I guess we can talk about that.  That

13   wasn't what your ruling was.  They didn't ask to put in

14   evidence that they somehow changed their behavior without

15   talking about an injunction or whatever, prior litigation.

16          And I'll just say on this, they never stopped

17   selling.  To the extent you consider their new declarations

18   and attachments, you might want to take a look at, or if

19   you do, one of the customer letters attached to Mr. Pond's

20   declaration, it is Exhibit 6 to his declaration, is the July

21   2014 letter to customers regarding the injunction.

22          One thing they're very clear to say is we're

23   going to keep on selling outside the U.S.  So it's further

24   evidence of inducement.  It says, hey, we're going to win.

25   We think we're going to win.  We're going to keep on selling

1    outside the U.S.  And they did nothing to change this,

2    again, this system and procedure they had set up to sort of

3    ensure all of these end parts could be sold in the United

4    States.

5            So that is kind of the response I think I made

6    on the injunction point.

7            All right.  That brings me, since Mr. Pond's

8    declaration is one of the new declarations, let me talk

9    about that.

10           This is, again, it's a unique situation.  I

11   doubt the Court has seen it before.  I have never seen it

12   before where somebody comes in after trial and in the

13   enhancement context offers you declarations that plainly

14   contradict prior testimony that the jury heard or saw and

15   contradicts your rulings.

16           I don't think there is any point in me repeating

17   why we think there are contradictions.  We say they are.

18   They say they are not.  It seems very plain for us that is

19   for you to decide.  But I wanted to highlight what we think

20   some of them are and then talk about the procedure here and

21   what you should do or what we respectfully suggest what you

22   should do.

23           The new W.H. Huang declaration we think has at

24   least two core contradictions.

25           One is he now says:  Oh, no, no, no.  In the

1   2008 meeting, we actually concluded we didn't infringe.

2   That is 180 degrees opposite of what he said before.

3           And also, he says in his declaration, well, gee,

4   I wasn't really aware of the patent, the relevant patent at

5   the time.  I wasn't aware.  But at the same time, his

6   testimony in this case was that he was told in 2004, so long

7   before this meeting, he was told that switching current

8   sources was the patent of another company.

9           So that is obviously a reference to what is

10  the '876 patent.  Was he told the patent number?  No.  That

11  is not germane.  He knew PI had a patent that covered

12  switching current sources; and now in his declaration he

13  says, well, I wasn't aware of the patent.  He was aware of

14  the patent.

15          It sort of bears repeating.  He was here.  There

16  was a big dispute about whether we could use his deposition

17  because he was here.  He could have testified.  They chose

18  not to put him on.  They chose to shield him from

19  cross-examination, which they can do.  But then they can't

20  have their cake and eat it, too, and put in this declaration

21  where he is not subject to cross-examination and have you

22  say, well, he signed it under oath.

23          Judge, you have to take it at face value.  That

24  is the *Tristrata* case, which I will come back to.  Judge

25  Farnan faced really almost exactly this issue.

1              Justin Chiang, in a way it is almost worse

2    because he contradicts both his prior testimony and your

3    ruling.  This was, we knew this was coming.  We knew this

4    was a possibility.  And his testimony on subjective beliefs

5    and on Fairchild's subjective beliefs has been excluded both

6    because they never disclosed it in discovery and because any

7    time we got close to it in deposition, witnesses were

8    instructed not to answer, including Mr. Chiang, the specific

9    witness, and we get a declaration that covers the waterfront

10   on that.

11              In addition to these other, his testimony here

12   was he didn't remember any specific conversation with Tom

13   Yang.  He couldn't.  He couldn't tell me, one way or the

14   other whether Tom said he infringed or didn't infringe or

15   why.  And he was instructed not to provide any detail.

16              All right.  Joel Pond.

17              I have already touched on this.  It's in the

18   briefing so I won't spend a lot of time on it.  This goes

19   to, of course you ruled on this.  You kept him out, the

20   customer letters, and now we have a declaration all about

21   the customer letters so it's completely contrary to your

22   ruling.

23              Still, it's a self-serving.  They still redact

24   the good stuff, right?  The column in the spreadsheet that

25   actually talks about back and forth with Mr. Pond.  Redacted.

1    And it is further evidence of inducement, as I already said.

2              This is in the briefing.  I won't repeat it.

3    One thing that is particularly interesting I think, though,

4    Your Honor, is who the letters were sent to.

5              The letters were not sent for the most part to

6    ODMs, weren't sent to any OEMs.  And so if you do consider

7    them, one of the things you should think about is, you know,

8    the game they were playing here is almost all their parts

9    are sold through distribution.  Distributors who resell

10   them, right?

11             So they're sending these customer letters to

12   distributors who don't make power supplies and who for the

13   most part don't have a role in the design of power supplies;

14   and they're saying, hey, you distributor, you can't, you'd

15   better not import these to the U.S., which is meaningless

16   because, of course, the distributors don't import to the

17   U.S.

18             What they didn't do is send the letters to the

19   OEMs and say these power supplies you are buying with our

20   chips that we're working with you on, you'd better not

21   import them into the United States.  They would never say

22   that to an OEM.  They never said that to an OEM.  On this

23   record, there is no evidence that they did.  And that is why

24   the inducement has kept right on ruling along.

25             THE COURT:  So you say, and I think I understand

1  why, that these declarations are contrary to my ruling, but

2  of course we don't have a jury here.  My ruling was with

3  what the jury can see.

4          MR. SCHERKENBACH:  Right.

5          THE COURT:  The question of enhancement is

6  ultimately for the four, deference to the four things the

7  jury found, but some factors as you acknowledge are for the

8  Court exclusively.  Some things such as good faith belief,

9  which *Read* expressly calls out, the jury had a record but

10 it was circumscribed by my rulings under Rule 403 in

11 assessing from their perspective that there was no good

12 faith, but just take for the sake of argument that there is

13 now evidence of good faith.

14         The law requires me to just turn a blind eye and

15 not look at that evidence because I didn't let the jury have

16 it, or is this a discretionary call?

17         MR. SCHERKENBACH:  On this record, I think you

18 have to disregard it.

19         THE COURT:  I have to limit myself to the jury

20 record.

21         MR. SCHERKENBACH:  Yes.  Yes, you do.

22 Because the evidence on which they're submitting these new

23 declarations -- excuse me.  The issues on which they're

24 submitting them are in particular in good faith is a core

25 jury issue.  That was an issue that the jury was instructed

1  on and heard evidence on and decided you can't revisit that

2  in the context of enhancement, particularly, particularly

3  where the evidence that is in these declarations, this is

4  not new evidence.  This is old evidence; right?

5          It might be, you know, we can save this case

6  for another day if somehow there is new evidence arising

7  after a verdict that bears on a party's good faith or some

8  other issue relative to enhancement.  Is that something you

9  can take account of?  I don't know.  Maybe.  Because you

10  wouldn't then have this issue of you passing on something

11  that was a jury issue in the first instance.

12          So, yes, I think that's the answer.  We all

13  live with that, Your Honor.  It's true in every trial, some

14  evidence comes in, some evidence doesn't come in.  That is

15  the record we all have to work with.

16          I think even you, as the Judge, in the

17  enhancement context, there is a lot of other things you can

18  consider that the jury did not, but I do not think you are

19  free to revisit things the jury already passed on and say,

20  well, gee, I know some other things and I am going to take

21  account of them.  I do believe that is the right answer

22  legally.

23          Now, I grant you, I don't think there is a case

24  directly on point on that question.  I can't cite you a case

25  that says I'm right.

1      I will say *Tristrata* is awfully close.  It's a

2  Judge Farnan case where somebody tried something very

3  similar.  They put in a new declaration from a trial

4  witness in the context of enhancement.  It was a post-trial

5  declaration.  It was a witness the jury in that case

6  actually saw and heard but he didn't say these things in his

7  declaration.  And Judge Farnan said, well, you can't do

8  that.  That is not appropriate.

9      And they made in that case, the defendant made

10 basically the same argument Fairchild is making here.  The

11 defendant said, well, under this *ACS* case, *ACS v Medtronic*

12 says, well, in the enhancement contention, the Judge can

13 consider the things the jury can't.

14     That is true, but only certain things the jury

15 can't, and only because the jury isn't appropriately told

16 about things like litigation behavior, for example.  And

17 the jury doesn't assess things like closeness of the case,

18 for example.  It's not license for the judge to revisit all

19 the factual findings the jury made.

20     Judge Farnan addressed that argument, shot it

21 down, and also said, oh, by the way, I don't think it is

22 reliable anyway because basically you did this as a way to

23 shield this person from cross-examination, so I'm not going

24 to take it at face value.

25     Now, of course, you are not bound by that.  I'm

1    not suggesting you are.

2              THE COURT:  It seems like there has to be some

3    line as to what folks can do after trial, but on the other

4    hand, when you all are arguing 403 motions to me, I don't

5    think any of us are thinking about, okay, if I don't let

6    the jury see this and then I get an enhancement motion, I

7    just have to look away from it, you know, thou shall never

8    consider this again if I don't let the jury hear it.

9              I could imagine situations where there is very

10   good reasons not to let the jury hear it but also very good

11   reasons to consider it post-trial in this context.

12             MR. SCHERKENBACH:  Well, fair enough.  I can't

13   say there would never be a situation where that isn't the

14   case.

15             I can't conceive of how that applies here.  This

16   was a very strategic decision by Fairchild as to what

17   witnesses are going to say or not say.

18             And the other thing I guess I would say is

19   as we pointed out in the briefing, if you consider these

20   declarations, we think it makes it worse for them, not

21   better.

22             That is your call.  You are going to have to

23   decide what to make of them on the credibility front and

24   others.

25             All right.  So let me just full stop there,

1    because that is all I have to say on the enhancement sort

2    of piece of it unless Your Honor has further questions.

3                    THE COURT:  I guess just this.  The verdict

4    was roughly 10 percent higher than what you all asked for.

5                    MR. SCHERKENBACH:  Right.

6                    THE COURT:  I think we hear an argument at least

7    in the papers, there has already been enhancement arguably.

8                    This is all a discretionary call.  Is that

9    something I should be considering if I'm upholding the $24

10   million judgment?

11                   MR. SCHERKENBACH:  Is it something you should be

12   considering?  I don't think, not in the sense of considering

13   that 10 percent punishment or deterrence because we have to

14   presume and we do presume the jury followed your instructions,

15   which are very clear.  That damages are compensatory and

16   they're not punitive.

17                   And as Mr. Warden explained, that bump, if I can

18   put it that way, is easily explainable both in terms of rate

19   and base, based on the evidence that is in the record.

20                   So to that extent, I don't think you can look at

21   that 10 percent and say, well, gee, I think that might

22   really have been putative or for deterrence.

23                   Now, that said, the other side of the coin is

24   in enhancing can you consider the amount of the verdict as

25   already there?  Of course you can.  Sure, and for whatever

1 that is worth.  Maybe you consider it in determining how

2 much to enhance.

3   On that point, I guess I would just say I don't

4 think anyone would suggest that a 10 percent increase over

5 what PI asked for is a meaningful -- in any sense of the

6 word would be a meaningful deterrent or even remotely

7 appropriate under the facts of this case.  I mean, again, in

8 Fairchild I, you came to a doubling of the total verdict

9 amount, as we have explained and I won't repeat.  It sure

10 seems to us to be a whole lot worse.

11   All right.  The last thing is just on fees;

12 and I'm not going to argue the fees beyond what is in the

13 papers.  I just want to point out the change in legal

14 standard.

15   Obviously, you denied the fees motion in the first

16 case.  That fact is not lost on us.  But *Octane Fitness* came

17 out afterward and changed significantly the landscape, the

18 legal landscape, as you know.  You have faced a lot of fees

19 motions since then.

20   So now you don't have to have objective

21 unreasonableness.  All you have to ask yourself is does this

22 case sort of, is it exceptional?  Does it stand out from

23 other cases?  It is very hard to see how this one doesn't.

24 And it doesn't have to be clear and convincing evidence.  It

25 is now just preponderance of the evidence.

1                    So the relevant evidence on that is in the brief

2     papers.  I won't repeat it.

3                    THE COURT:  So you didn't say it today, but your

4     papers, it's all over the papers, "This is truly the worst

5     case of patent infringement that the Court will likely ever

6     see."  And all of us in this room have seen a lot of patent

7     infringement cases, and hopefully we will all see many more;

8     right?

9                    It's a pretty bold statement, and a lot of what

10    you are asking for seems predicated on me agreeing that this

11    is truly the worst that I will likely ever have seen or will

12    see.

13                   You haven't made that argument today.  Do you

14    want to make a pitch for why this really is the worst that I

15    have ever seen?

16                   MR. SCHERKENBACH:  Sure.  You know, I start with

17    why am I standing here 15 years after we first brought these

18    patents to Fairchild's attention?  15 years.

19                   I can't think of anything they could have done

20    to make the process more painful or difficult or to hide

21    their tracks more than they have.

22                   Willfully infringed the first time, reverse

23    engineering, copying, industrial stalking, corporal culture

24    of copying.  I mean these are statements that judges have

25    made, it's not my argument, about this company.

1              And then they do it again, with no reason to

2    think that they had a defense.

3              THE COURT:  Okay.  Thank you.  We're going have

4    to take a short recess, and then we will hear from defendant.

5              (Brief recess taken.)

6              *     *     *

7              (Proceedings reconvened after recess.)

8              THE COURT:  Mr. Olson.

9              MR. OLSON:  Thank you, Your Honor.  I will

10   promise to try to be brief.  I'm afraid that is harder to

11   do, but I am aware the Court has important engagements this

12   afternoon.

13             THE COURT:  I do, but I have to try to leave

14   you time.  You have 40 minutes if you want to use it.

15             MR. OLSON:  I don't intend to use all of it, but

16   that is certainly my hope.

17             On the enhancement motion.  I'll start and

18   hopefully I will leave myself some time to circle back to

19   it at the end.

20             On this idea, which just pervades the motion,

21   that this is the worst case of infringement one will ever

22   see, this Court will ever see.  There is a great deal of

23   hyperbole being used in this motion, a great deal of

24   hyperbole what the nature of the case was, what the conduct

25   was, what the sources are in terms of the duration, much

1   of what resulted from an appeal that was the result of

2   misstatement and insistence that causation not be included

3   and in which the appeal actually reversed on a number of

4   issues, and that is unsuccessful, as well as the fact there

5   was underlying in the first trial a number of wins around

6   the issues of direct infringement and otherwise.

7          But at the end of the day, this is an equitable

8   motion.  It is an equitable motion that is provided to,

9   given to your discretion.  And I think you're in the best

10  position to decide whether this the worst case you have ever

11  seen because you have seen a lot of cases and will see a lot

12  more.

13         On the equitable issue, the reason I focused on

14  it and this issue of it being provided in coming to your

15  discretion is this idea that you should be, or that the

16  court should be and other courts should be blinded to other

17  information and be solely restricted to what is in the

18  record around subject matter, for example, like material

19  that was excluded under 403.  There is no case that says

20  that.

21         There are a number of cases that speak to the

22  contrary.  *Advanced Cardiovascular* is one.  That is a

23  Federal Circuit case.  *Idenix* by this court, by Your Honor,

24  says the same thing.

25         And, of course, the purpose of 403 is because

1    for a jury, some things will be unduly prejudiced compared

2    to their probative value, but that is not a concern with

3    respect to the Court.

4           So when we come to this issue of whether you

5    should be blinded to the evidence, I will just note in a

6    number of respects, Power Integrations wants to rely on

7    evidence outside of the record about prior litigation,

8    the timing of it, circumstances of it, for example, the

9    acquisition question, but doesn't want to be limited to

10   the evidence there.  So it's of two minds on this question

11   itself.

12          Moreover, the 403 question when argued to the

13   Court is really about -- as Your Honor said, about what the

14   jury should receive.

15          Certainly, there are a number of issues,

16   closeness of the case, the litigation and nature of the

17   parties, the question of whether there was sanction motions,

18   the existence of other circumstances, and the facts and

19   questions around duration and conduct, which are all issues

20   outside of the scope of what the jury will hear.  And you

21   are certainly not kept from seeing them, nor is there any

22   reason to think that the Court is not able to adequately

23   address the question and understand the issue of what

24   happened in the restatement, the timing of it, what happened

25   with customer letters, the injunction, et cetera.  So I

1     think that is just a mistake.

2              Let me then address one question that will come

3     up in the response which goes again to the question of the

4     Court's ability in its equitable discretion to consider all

5     factors is the scope and size of the verdict.

6              The verdict is more than all that they asked

7     for.  Of course, we would argue it's more than the evidence

8     can bear, I have argued that, but certainly everyone agrees

9     it is more than has been asked for.  *Informatica* says that

10    is a fair factor to consider.

11             *Apple/Samsung* is not a published opinion.

12    *Apple/Samsung* says that is a factor that can be considered.

13    There is no case, they don't cite any case that says it

14    is not a factor to be considered.  And it certainly is

15    something that should be considered as a part of the full

16    discretion of the Court in evaluating the evidence.

17             What I would like to do on the enhancement

18    motion is take you through a brief summary of the events

19    that I think ultimately are not disputed, including some

20    events that are incorporated by virtue of these customer

21    letters in the injunction.  They're not actually disputed

22    events.  They're not disputed whether they occurred even

23    though they didn't make it into the trial record in some

24    cases.  And as to the remainder that actually come from

25    the trial record, then I will go through each of the *Read*

1    factors.

2              When you start with this case, you start with

3    the System General products.  You start with the System

4    General engineers, and they are in Taiwan.  They

5    independently design a relevant, overseas, circuit.

6              There is no evidence that the engineers that

7    created that circuit copied anything from Power Integrations.

8    Not the patent, not their product, not anything.  There is no

9    evidence of that whatsoever.

10             The only evidence that has been presented is

11   by Mr. Kelley saying there is a similarity between these two

12   drawings, but, of course, there will always be a similarity

13   in any infringement case.  There has to be a similarity.  In

14   fact, the patent must read on -- or the product must -- yes,

15   the patent, the claims must read on the product.  So they

16   independently do that.

17             Then they're making this product overseas,

18   selling it overseas to primarily in Taiwan but also in other

19   Asian countries to ODMs who are themselves making something

20   else overseas, and then there is a downstream chain that we

21   have already talked about.  And it is undisputed that

22   99.5 percent of Fairchild sales of these products occurred

23   overseas.

24             The amount of direct infringement is less than

25   $600,000 in total.  It has nothing to do, nothing nearly to

1    do with the total of the verdict.

2          This case turns entirely on inducement and the

3    question of inducement; and there isn't any question that

4    absent inducement, sales overseas are a completely legal

5    activity.  It is not infringement, let alone being willful

6    infringement or lack of good faith infringement or any other

7    form of infringement.

8          We have a circumstance in which both parties,

9    Power Integrations and Fairchild, don't actually know how

10   many products came back to the United States.  They say that

11   says -- that gives them the right to do a bunch of what we

12   think are wrong guesses and inferences, but there isn't any

13   question there isn't evidence that people knew or that they

14   had any control.

15         Now, they say that wasn't an element of

16   inducement.  And I agree it is not one of the four elements,

17   per se.  I believe it goes to successful communication and

18   causation, but it certainly goes to question of egregiousness

19   and good faith and the scope of conduct.

20         If this is happening by downstream parties that

21   are beyond the process that you are participating in, this

22   design win process with the ODMs, by retailers and others,

23   and you have neither reporting, nor visibility into it, nor

24   control regarding it, that goes to the question of

25   egregiousness and all the other adjectives used by *Halo*.

Furthermore, we know that there are significant objective indications that exist regarding the validity of this patent both at the time of the acquisition and also for ten years in this case.

The '876 patent was in reexamination for ten years.  A number of the patents, the claims in which we started disappeared by virtue of that.  It is not disputed that those things happened.  It is also clear that the jury did not receive that evidence.

The Court believed under 403 it was not proper, but there isn't any question about whether it occurred.  The Court previously already identified this as being a relevant indication within the *Read* factors and at a time when the jury notably did not get that evidence, did not get that evidence but the Court still considered it in its decisionmaking and reflect upon this question of whether or not they were valid.

Moreover, Fairchild, on at least four occasions, in fact I think it's four plus the injunction, identified for customers by their letters the risk associated with the use of these products in the United States and encouraged them, -- this is not disputed -- encouraged them to use alternative products if they were purchasing or intended to use it in the United States.

And Mr. Scherkenbach just made a bold claim that that went to no ODMs, but the Pond declaration shows that

1    that is absolutely wrong.  And the Pond declaration, this

2    portion of the Pond declaration was given before trial and

3    it was given now.  The list includes Delta, it includes

4    Acvel, it includes a number of companies that were

5    identified specifically as ODMs.  They did go, the letters

6    went to ODMs.  And, in fact, every customer, anyone

7    purchasing -- not just distributors, anyone purchasing had

8    received these letters and then also received after the

9    injunction a clear label over the top, as shown in the Pond

10   declaration, a clear label over the top of the datasheet

11   that said this project is not to be used in the United

12   States.  Is not.

13            THE COURT:  If the Pond declaration is stricken,

14   is that fact in the record that the ODMs got the letter?

15            MR. OLSON:  No.  It is absolutely the case the

16   customer letters, all the customer letters were excluded by

17   the 403 ruling.

18            THE COURT:  Right.  I don't mean that, but the

19   fact that you say they went to ODMs and not just OEMs;

20   right?  That is your point?

21            MR. OLSON:  Yes.  Both the letters and who

22   received the letters is not part of the trial record.

23            THE COURT:  Not part of the trial record, but is

24   it part of the record absent the Pond declaration?

25            MR. OLSON:  Sure, in that we submitted the Pond

declaration in advance of trial, this portion of the Pond

declaration about our compliance of the injunction, both

what the injunction involved, who the letters went to, and

also the contents of each of these documents that reflect

the restrictions.

So Fairchild, in 2008, in 2012, in November of

2013, says don't use these products.  And in November of --

you should be aware of the risk of using these products in

the United States, in November of 2013 says do not use these

products in the United States.  And then, of course, there

was the injunction which was then vacated but Fairchild

continued to comply.

There is, as the Court is aware, no evidence of

any finding of any litigation misconduct.  There has been

no request for sanctions.  There has been no other

indication by way of motion or otherwise of a reprimand from

the Court or other conduct.  And that was considered by the

Court previously.  It remains a factor in evaluating both

enhancement, and I think it's even more important factor

when you talk about an extraordinary case motion.

Now let me turn to each of the *Read* factors.

On copying.

For the specific products at issue here, the

evidence reflects independent development.  There is no

evidence that says there wasn't independent development.

1                    There is no specific evidence that any engineer

2          at System General PI's products or its patents.

3                    The evidence of copying in the 2004 case related

4          not to these products but to different engineers at a

5          different company in a different country at a different time

6          using a different circuit involving different products.

7                    Now, we are not saying you are not allowed to

8          look at the evidence of the 2004 case and events and

9          circumstances there.  You can.  But if you are looking for

10         the question of whether there was copying here, there is no

11         evidence of copying.

12                   On the question of good faith.

13                   Mr. Scherkenbach focuses primarily around the

14         issue of validity and whether or not there was coverage of

15         the claim and acts as though we should put the question of

16         inducement to the side.

17                   But 99.5 percent of the activity in this case

18         has to do with inducement.  And under those circumstances,

19         the Federal Circuit's position about this being a close

20         case, the fact that they're relying on a theory that they

21         can't even point to a Federal Circuit case regarding this

22         inducement of an indirect infringer and the fact that people

23         understood and knew they were selling 99.5 percent of their

24         products overseas and did not see, did not control and

25         visibility, they again say -- they don't say that is wrong.

1    You have control and visibility.  They say it's just not

2    relevant to inducement, but it is certainly relevant to this

3    question of whether you had a way to affect good faith

4    around the nature of your conduct.

5              I take this conduct, and this one, this quote

6    comes from Mr. Sutherland:

7              Who is it that is importing the third into the

8    United States?

9              That's a good question.  We are kind of

10   disconnected from that part of the process because we're not

11   involved in it.  I could imagine it's companies like Dell or

12   Samsung who lived around the world and bring them into the

13   United States.

14             This is the nature of the business that you are

15   selling to people in Taiwan and in China and do not know

16   when, how, and under what circumstances it is coming into

17   the United States.  That is relevant to your good faith.

18             On the question of -- and this is repeated.  To

19   be absolutely clear, that comment from Mr. Sutherland was in

20   connection with his most recent trial, the *Optium* trial we

21   submitted with respect to it.  But it's reflective of the

22   same evidence in this case that people did not know, did not

23   receive reporting and did not have a way of identifying.

24             They speak only to this idea of they asked,

25   there is the question of Iran.  They say you can't send

1    things to Iran.  It would be illegal under the United

2    States.  So Mr. Sutherland says, yes, we tell our

3    distributors don't sell to Iran.

4         The distributors are not the folks who are

5    bringing product into the United States.  Undisputed.

6    0.006 percent, actually I think it's three zeroes, but six

7    percent of the products from distributors came into the

8    United States.  That is not the issue.

9         Now, let me turn nonetheless to the good faith

10   around validity and noninfringement.

11        On validity, I think the reexamination is both

12   undisputed and quite relevant to this question.  The

13   existence of a question mark and the then reexamination and

14   cancellation of certain claims that are related on the key

15   issues involving very similar art are relevant to the

16   question of validity.

17        THE COURT:  Isn't it true, though, there was

18   at least one claim for each of the patents that was never in

19   the reexam?

20        MR. OLSON:  There is.  And Fairchild's belief

21   about that issue is clearly identified contemporaneously in

22   the Chicony letters that are part of the Pond declaration.

23   Now, admittedly that was one of the letters that was

24   excluded but it was very clearly stated to what it is their

25   beliefs and opinions were, and that the customer letters

1     have never been withheld.

2              Nor has there been a failure to allow discovery

3     on the customer letters.  They were part of depositions in

4     2009.  They were part of depositions in 2012.  They were

5     part of depositions last year.

6              The customer letters have been present and

7     available.  In fact, there were, many of them were published

8     on Fairchild's website and were free and available to the

9     public.

10             There is not a question of whether that -- and

11    if the contention was those letters waived privilege, then

12    that needed to be made as part of some discovery or activity

13    before.

14             But the customer letters quite clearly

15    identified both the reexamination and the relationship

16    between the Chicony letter, the relationship between the

17    existing claims and the prior claims, and how and why they

18    add something to the art.

19             That was also present in Mr. -- in our expert's

20    expert report to which we cited and is before the Court in

21    terms of the record on why and how they are related.

22             Now, we weren't allowed to put that evidence in

23    because, of course, that would require us to respond to and

24    incorporate the reexamination which was excluded under 403

25    and under which we can't apply a determination.

1          On Mr. Huang.

2          Mr. Huang's testimony plays a significant role

3     in the way they look at it, but I want to read it so that we

4     are clear about what it is he is saying.

5          He was asked a question about whether or not

6     given that his comment that we were doing what our patent

7     called for, we had gotten our own patent, we had done our

8     own independent novel development of a circuit, obtained our

9     own patent, and that that was a reason why he believed they

10    didn't infringe.  And so the question was asked:

11         Question:  Do you understand having your own

12    pant on your own circuit, for example, you referenced a

13    switching capacitor patent.  That is not an excuse for

14    committing patent infringement, right?

15         His answer is:  Later on -- they keep is

16    skipping later on -- but later on, we came to realize that

17    using a switching capacitor was insufficient to do a

18    design-around to avoid infringement of the '876 patent.

19         The reason we put in the declaration is because

20    that has been misstated as a statement that we understood

21    ourselves to infringe.

22         The context is there was a request, and this was

23    disclosed in discovery, there was a request by Mr. Chiang

24    they developed a further design-around to be further away.

25         They then went to an even further design, and

1     it's that evidence that is being discussed.  And we put it

2     in our statement, and I'll read it.

3               When he then came back to confront in the

4     deposition, Mr. Huang would say:  But you really believed --

5     and it's at lines 437, 25 to 438, 15 -- you really believed

6     that you infringed at the time?

7               He said:  No, the question outstanding was

8     really around what was the proper design around?  How to get

9     farther away.

10              So that is why Mr. Huang -- and if it's true

11    that the Court cannot consider anything except what is in

12    the record, then Mr. Huang's testimony on this point is

13    mostly out of his declaration, but even the language itself,

14    later on, not in 2008, and about a design-around, indicates

15    that it's going to a different direction.

16              THE COURT:  Now, you said some of that was in

17    the record prior to the recent declaration.

18              MR. OLSON:  Correct.

19              THE COURT:  And I would find that in his dep.

20              MR. OLSON:  Deposition, correct.  Exactly.

21    Including that he didn't have the patent at the time that he

22    was doing the work.  That he understood that he should use

23    switching capacitance because we understood that it didn't

24    infringe.

25              And let me speak to this issue because something

1    really caught my attention in what Mr. Scherkenbach argued.

2              He said Mr. Chiang never asked the question of

3    whether or not they infringed.

4              Now, that is actually just wrong.  The only way

5    that you can make that claim is by blinding yourself to the

6    declaration, then to his depositions.  Because in his

7    depositions and in his declaration, he says I did ask Tom

8    Yang after the -- after the acquisition, and I did ask Tom

9    Yang after the case was filed, do you think you infringe?

10              And he said that he did not think he infringed.

11              I will agree, because Mr. Scherkenbach will

12    come back up and say, but he didn't know the details of it.

13    I agree he didn't know the details of it.  He is not an

14    engineer, he was a businessperson, but he did ask the

15    question, and to suggest that he did not is not accurate.

16              Let me deal with the litigation conduct.

17              The litigation conduct in this case, there

18    has been no motion for sanctions.  There is no finding of

19    misconduct.

20              The argument that changing experts is enough

21    to be an improper action.  If that is true, PI has changed

22    experts a number of times.  If they had not, we would be

23    with a damage evidence 65 percent less than it is, and it

24    changed experts.  Frankly, there is just no case that has

25    ever said that is a factor.

1              Size is neutral.

2              On closeness of the case, the Federal Circuit

3    said inducement, which is 99.5 percent, is a close case.

4              The direct infringement is $600,000.  The

5    Federal Circuit was itself saying the issue of closeness, we

6    think you can look to the other evidence, whether it be the

7    experts or otherwise to speak to it.

8              And the closeness itself is shown again with

9    respect they're relying on a theory that is not even found

10   in a Federal Circuit case.

11             On duration.

12             Duration, they claim ten years in activity, but

13   that the only way you can actually do that is to say that

14   you are not going to pay attention to any evidence about the

15   injunction, and fails at all to account for the fact that

16   all of the evidence produced in the trial record or anywhere

17   else stops essentially at 2011 and 2012, so just six years

18   of activity.  And it also ignores entirely, deciding to stop

19   selling overseas and to tell people to stop selling, stop

20   using them in the United States is not enough.

21             When the case is inducement, you are allowed

22   under U.S. law to compete overseas for overseas business

23   with overseas sales, and to ignore that is to misunderstand

24   a key activity.

25             I talked about remedial activity both in terms

1    of the letters themselves.  I'm happy to read them to you,

2    but they are quite clear in saying that the customers should

3    use something else if they intend to go to the United

4    States.

5                    It's also true that a design-around was created,

6    was sold.  In effect, they say we're accusing it in another

7    case.

8                    And there is the voluntary cessation in

9    November of 2013 in sales to the United States as well as

10   the continuation of the injunction afterwards.

11                   Now, on the question of extraordinary, the

12   extraordinary relief or whether it's extraordinary under

13   284, 285.  That usually focuses almost entirely on

14   litigation conduct.  There just is not evidence here that

15   reflects any litigation misconduct.

16                   The duration point is almost entirely

17   attributable to bifurcation and an appeal but not due to

18   some misconduct by Fairchild in connection with this.  And

19   in substantial portion, that appeal was successful, and we

20   rely very heavily.  We're not trying to run from the appeal

21   on successful communication.  We adopt it.

22                   I do not think given the nature of the

23   requirement for extraordinary relief that that is

24   appropriate.

25                   I'll speak just to interest and then come back

1    to this issue of worst case.

2              On interest, obviously, the Court's normal

3    process is well known.  The one thing I would say that

4    reflects a fundamental problem here, and that is a

5    fundamental problem in the record, in order to do interest,

6    you have to push back evidence to prior periods.

7              The only way they do that is by reference to

8    worldwide sales in Mr. Barnes declaration, not any U.S.

9    sales, because they don't know when U.S. sales were.

10             That reflects a fundamental problem about the

11   case, but it also presents a fundamental problem in terms of

12   the interest declaration.

13             Now, let me address *Tristrata*, and then I will

14   address the worst case idea.

15             *Tristrata*, the parties came back afterwards and

16   tried to introduce actual opinions of counsel regarding

17   their conduct that had not previously been disclosed or

18   revealed.

19             That I think is a very different circumstance

20   than identification and inclusion of evidence that explains

21   and is consistent with prior deposition testimony which is

22   what we believe is true of the declarations.

23             It's also very different from a circumstance

24   in which the parties were not allowed to talk about the

25   evidence at trial, but then it was appropriate to have it

1   back in front of the Court with respect to an undisputed

2   issue regarding restatement, and the customer letters.

3              THE COURT:  In your view then, what, if any,

4   limit is there on what the party can do in terms of

5   declarations or new evidence after trial in connection with

6   these 284, 285 motions?

7              MR. OLSON:  So I do agree with *Tristrata.*  I

8   don't think we did that here.  In fact, I don't think

9   there is any waiver at all.  To introduce an evidence

10  of   an opinion of counsel after the fact and not ever

11  disclosed previously in litigation strikes me as

12  problematic.  Problematic because there is no opportunity to

13  have evaluated it in any way during the discovery process.

14  But that is certainly not true of the restatement, and it's

15  certainly not true of the customer letters.  So that strikes

16  me as an example.

17             I will say I hesitate, Your Honor, to identify

18  what other circumstances.  I'm sure there may be other

19  issues, for instance, with proper disclosure within the

20  timing of the Court's rules or, you know, this is -- I

21  guess the way I would put it is this is one of the types of

22  motions that is most given to the discretion of the Court

23  and therefore it can take I think in many ways as expansive

24  a view as it wishes regarding what factors to account for.

25             THE COURT:  So --

1          MR. OLSON:  -- including the evidence.

2          THE COURT:  It would seem to follow if I read

3   the new declarations as being inconsistent with the prior

4   testimony, then that is new evidence.  And it would seem to

5   be, under the thinking of *Tristrata* and what you just

6   articulated, I should exclude it.  That is, it would be a

7   prerequisite arguably to allowing the declarations to read

8   them as being not inconsistent with the prior testimony.

9   Would you agree with that?

10          MR. OLSON:  I don't, but let me see if I can

11   explain why.

12          First of all, I don't agree they're inconsistent

13   but that is different than the nature of your question.

14          I think the Court would have the freedom to

15   evaluate an inconsistent declaration.  I think the Court is

16   then well within its discretion if it finds the declaration

17   is inconsistent with the prior contact to, in the exercise

18   of its discretion, to give it not much weight.

19          What I think happened in *Tristrata* was a

20   question of there being a repeated decision to rely on

21   privilege and then production of an opinion itself.  Right?

22   Which is different than the question of whether or not

23   people are explaining testimony that the other party is

24   saying but for other reasons couldn't be presented at trial.

25   And certainly it's very different from the Pond declaration

1     with respect to the restatement and the customer letters.

2              Now, in some ways it's a tempest in a teapot

3     because if the Court believes -- I invite the Court and the

4     Court should look at and find out if it is inconsistent.  If

5     the Court finds it is inconsistent, whether you strike it or

6     use it, it will be of little impact to the final decision.

7              And I will say the Joel Pond declaration is in

8     no way stated as being inconsistent with any prior

9     testimony.  In fact, the only other prior testimony from

10    Joel Pond was part of the declaration itself which was

11    previously submitted.

12             Worst case ever.

13             Given the overseas nature of the case, given

14    the lack of visibility, given the alternative reasons for

15    why the duration has gone on, the argument that this is the

16    worst case ever is just not -- is not consistent with the

17    recognition of the facts and circumstances of the case.  It

18    was heavily litigated.  We're not suggesting otherwise.

19             Many, many patent cases are heavily litigated,

20    but I have been in cases where there has been theft out of

21    the refrigerator of the very item make the product and then

22    10 years, 12 years of litigation over it, followed by a

23    jury trial, followed by an appeal, followed by more than

24    $300 million in damages in *UC v Genentech*.

25             I have had a case in which the parties went on

1    in *Apple/Samsung* again and again an again; and even though

2    in the first hearing involved in the case, the Court

3    literally put up one version of the Apple product and put

4    another, the Samsung product, and said, counsel, just tell

5    me which is which.  And counsel couldn't do it.

6            The variety of conduct that occurs in cases in

7    which we have had to bring sanctions motions and other

8    activity, none of that is in this case.  That is an over-

9    statement.  This was a heavily contested case.  We continue to

10   believe that there are parts of it that deserve to be heavily

11   contested, but there is no sense to which this is the worst

12   conduct you will ever see.

13           THE COURT:  In the earlier case, I did enhance

14   damages?

15           MR. OLSON:  Yes.

16           THE COURT:  Help me understand how a decision

17   for you here could be harmonized with that.

18           MR. OLSON:  A decision, well, first of all, the

19   facts and circumstances of each case stand upon their own.

20   The amount of damages awarded in this case is reflective of

21   a difference.

22           Second, the existence of this successful

23   communication issue arising from the Federal Circuit

24   decision as well as this, the novelty of this argument that

25   it's inducing indirect infringement or that there is

transference between the ODMs and OEMs is itself a material

difference in the evidence regarding the case.

And I do think that the difference in copying.

That is, the evidence of that case was they just copied.

They just copied.  That is not true of the evidence on

System General.

And on this question of whether or not we

acquired System -- that Fairchild acquired System General

because of this.  Here, they're just ignoring the testimony

in the record.  Mr. Chiang's testimony -- I'm happy to give

you where you would find it -- says the reason that the

acquisition was done was because of their location in Taiwan

and because of their innovative technology.

All that otherwise exists is this claim of, this

claim of closeness in time and nothing better.

But that itself, that copying piece I think is a

significant distinction, and material to this outcome, and

material to their good faith belief and the effects of where

it goes.

THE COURT:  Okay.  Thank you very much.

Mr. Scherkenbach, you can come back if you wish.

MR. SCHERKENBACH:  Yes.  Thank you.

I'll focus for the most part on I think pointing

out the difference between argument by counsel and evidence

that is actually in the record because that obviously is

1   very important in your deciding what to rely on.

2                Let me just go in reverse order, Your Honor.   I

3   think it might be easiest starting where counsel left off.

4                Their response on worst case ever.

5                I don't think you will find, we're not aware of

6   one, another case where the same party was found guilty of

7   willful infringement on successive occasions of the same

8   patent.

9                We looked for one.  We couldn't find one.  So

10  that, again, that is an objective indication.

11               Counsel refers to other cases he has

12  participated in where there were bad actors.

13               Maybe so, but here we have the fact that we have

14  successive findings of willful infringement of the same

15  patent by the same party.

16               Continuing in reverse order.  *Tristrata*.  Please

17  do look at the case.  There are two problems with their

18  argument that distinguish *Tristrata*.  One is that case

19  actually said, counsel said, well, that was where they tried

20  to interject new opinions of counsel after the fact.

21               Actually, Judge Farnan said that the new

22  information was not the equivalent of a formal opinion of

23  counsel.  So it actually wasn't viewed a formal opinion

24  of counsel.

25               But the more fundamental point is the Pond

1    declaration and letters that they want you to consider now

2    after the fact, their only pertinence is essentially an

3    opinion of counsel.  They point to the statements in the

4    letters where the lawyers have done an analysis and the

5    lawyers are telling the customers, hey, we think we're going

6    to prevail.  Look at these reexams.  We're going to appeal.

7    We're going to vigorously contest ourselves.  I mean those

8    are the equivalent of an opinion of counsel injected after

9    the fact.

10             That should have been presented to the jury if

11   it had been timely and appropriately disclosed in discovery,

12   which it was not, and therefore the jury never had an

13   opportunity to consider it.

14             The declarations, again, continuing sort of in

15   reverse order.

16             Mr. Chiang's declaration.  Counsel quoted some

17   piece or paraphrased, I should say, some piece of Mr.

18   Chiang's testimony about having talked to Tom Yang.  What

19   you didn't hear and what we showed you in the briefing over

20   this issue was that Mr. Chiang was instructed not to answer

21   a whole series of questions about what he talked to Mr. Yang

22   about, what did Mr. Yang tell him, what did Mr. Chiang

23   understand.  I think you have that deposition.  The

24   deposition taken in this case.  If you go look at it,

25   roughly at pages 70 to 78, you will see that we tried to get

1    to the bottom of that and were impeded.

2              That was fundamental reason that you determined

3    that Mr. Chiang would not be allowed to testify at trial

4    about whether he believed there was infringement or not and,

5    if so, why.

6              The W.H. Huang testimony that counsel referred

7    to.  I want the timing on this to be clear.

8              Counsel quoted to you this testimony about later

9    on, and he emphasizes, "later on" SG came to realize that

10   their design didn't avoid the patents.  And this is in the

11   testimony on, but the later on refers to the 2008 period,

12   okay?  Not some time after 2008.

13             Mr. Huang said, look, we first designed the

14   parts, I think it was 2005.

15             At that time, they were aware of the patent.

16   Tom Yang said another company had a patent.  And they were

17   going to get their own patent and indeed got their own

18   patent.  And so maybe at that time they thought there was no

19   problem.

20             Later on, meaning 2008, after they were sued,

21   they realized that was not going to avoid the patent, that

22   their substitution of, simple circuit substitution of

23   capacitor for current sources is not going to get it done.

24   So I just don't want you to think that the later on refers

25   to some point later in the 2008.  It does not.

1          Okay.  Reexams.

2          They're interesting, but again no evidence that

3    any decisionmaker at Fairchild relied on the results of the

4    reexams, even the interim results of the reexams.  Putting

5    even to one side the fact that they didn't impact two of the

6    three infringed claims, one of which was from each of the

7    patents-in-suit.

8          This, there is a certain theme here for, which

9    is, this goes to the *Halo* case.  If you look at, the Supreme

10   Court's primary concern in that case was to say, look, we

11   can't have a rule of willfulness or enhancement where

12   lawyers coming up with things after the fact are enough to

13   get a party off the hook when the party at the time it was

14   acting had no reason to even know of what the legal theory

15   was or what the legal analysis was and there is no evidence

16   they relied on it.

17         That is exactly what Fairchild is trying to do

18   here.  Their lawyers decided to file reexams.  They had some

19   success on other claims, not on these claims and, therefore,

20   what?  Therefore, Fairchild should be exonerated.  That is

21   actually the lesson in *Halo* is, no, they shouldn't because

22   there is no evidence they relied on it.

23         Okay.  This, the last, the other point counsel

24   made on good faith is that they keep emphasizing 99 percent

25   of the sales are overseas.  99 percent of the sales are

1    overseas.

2              Well, fair enough, but it ignores the testimony

3    that Fairchild knew and intended large numbers of those

4    products would come to the U.S.

5              The actual evidence was that.  We showed you.

6    Mr. Thornburgh went through some of it again here today.  So

7    the fact that the initial sale is overseas is a tiny part of

8    the relevant story.

9              Customer letters.

10             Well, actually back up.  So then there were a

11   series of what counsel referred to as undisputed events.

12             Let me run through that because some of them are

13   disputed quickly.

14             THE COURT:  You have about two minutes.

15             MR. SCHERKENBACH:  Two minutes.  Okay.  Let me

16   just focus on copying.  Okay?

17             Counsel argues there is no evidence of copying

18   in this case, and that is a big differentiator.

19             I covered this to some degree in my original

20   remarks.  In this trial record, there is evidence of copying

21   that is unrebutted, and that is that SG had the patent.

22   They had the PI patent.  The similarity and the circuits is

23   striking but for this substitution of capacitors for current

24   sources and the relevant part of the circuit which our

25   expert said technically is a meaningless change.

1          Their expert did not rebut it.  They presented

2     no witness at trial to rebut it.  No fact witness to rebut

3     it.  The only thing you have now is this new W.H. Huang

4     declaration where he comes in and says, oh, well, I didn't

5     copy anything.  I did everything independently.

6          And candidly, you are going to have to wrestle

7     with I guess what to do with that because had the man come

8     to trial and then cross-examined, the evidence might be very

9     different.  You might have a very different view of what

10    happened.

11         But just so we're clear, the jury was instructed

12    on copying.  You have to infer they found in our favor on

13    copying; and I just don't see how that can be undone by an

14    after-the-fact declaration of a witness who was here at

15    trial, could have testified, and didn't.

16         Okay.  I think the last point I will make is

17    just, on the case, the *ACS* and *Idenix* cases, Your Honor.  I

18    covered them on my slide 15, but it's I think fair to say

19    that neither case had anything to do with saying a court

20    could in the enhancement context consider anything like the

21    sort of evidence that they have tried to put into this

22    record, these sorts of declarations.

23         It's really apples and oranges.  To try to, you

24    know, retry the case, as it were, in post-trial declarations

25    is I think unprecedented.

1                    That's all I have.

2                    THE COURT:   Thank you.

3                    Mr. Olson, do you want to add anything?

4                    MR. OLSON:   This will be anti- climatic but it

5        is only one.

6                    The customer letters have an independent

7        relevance regarding what we did as a remedial measure, and

8        the customer letters are in fact attachments to various

9        motions throughout our case, and of course the customers

10       letter itself is an attachment -- well, the July customers'

11       letter is an attachment to part of the injunction.   These

12       are not all being introduced solely because of that they're

13       a closeted or other opinion of counsel.   These were

14       communications to people about why they should be seeking

15       other materials if they intend to use their product in the

16       United States and that in fact in November of 2013 do not

17       need, do not use these products for sale in the United

18       States and we're putting a banner on it.   This was even

19       before the injunction to not use, so they have an

20       independent relevance.

21                   I think the remaining topics I have covered and

22       I won't press forward with it.

23                   THE COURT:   Mr. Scherkenbach, anything further

24       you want to say on that?

25                   MR. SCHERKENBACH:   Just on the customer letters,

1    you will find a few ODMs they were sent to.  ODMs, not all

2    the ODMs by any means, and my focus was on none of the OEMs,

3    the ultimately end customer who did the importing.  I don't

4    think there is any evidence that any OEM got a letter.

5              Thank you.

6              THE COURT:  Thank you.  Well, the time is up.

7    Thank you for the helpful arguments.  I'm going to take

8    everything under advisement both in the case that was argued

9    today and in the case that you all submitted on the papers.

10   We will turn our attention to it as soon as we can.

11             Have a nice weekend.  Safe travels to all of

12   you.  We will be in recess.

13             (Hearing ends at 1:57 p.m.)

14

15        I hereby certify the foregoing is a true and accurate
     Transcript from my stenographic notes in the proceeding.

16

17                        /s/ Brian P. Gaffigan
                          Official Court Reporter
18                          U.S. District Court

19

20

21

22

23

24

25